UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
UNITED STATES OF AMERICA,        :
                                 : Case No. 23-CR-00157-CMR-1, 2
                Plaintiff,       :
                                 :
           vs.                   : Philadelphia, Pennsylvania
                                 : October 31, 2023
AL-ASHRAF KHALIL, ISAAM JAGHAMA, : 10:50 a.m.
                                 :
                Defendants.      :
                                 :
. . . . . . . . . . . . . . . . .:
```

# SEALED

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE CYNTHIA M. RUFE
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

| | |
|---|---|
| For Plaintiff: | Amanda R. Reinitz, Esq. |
| | Michael R. Miller, Esq. |
| | U.S. Attorney's Office |
| | 615 Chestnut Street, Suite 1250 |
| | Philadelphia, PA  19106 |
| | |
| For Defendant Al-Ashraf Khalil: | Angelo C. Peruto, Jr., Esq. |
| | 2016 Spruce Street |
| | Philadelphia, PA  19103 |
| | |
| For Defendant Al-Ashraf Kahlil: | Gerald A. Stein, Esq. |
| | 1500 Market Street, Suite 2727 |
| | Centre Square West |
| | Philadelphia, PA  19102 |
| | |
| For Defendant Isaam Jaghama: | Michael N. Huff, Esq. |
| | 601 Walnut Street, Suite 545W |
| | Philadelphia, PA  19106 |

APPEARANCES: (Continued)

Court Recorder:              Erica Pratt
                            Clerk's Office
                            U.S. District Court

Transcription Service:      Jessica B. Cahill, CER/CET-708
                            Maukele Transcribers, LLC
                            467 Maukele Place
                            Wailuku, Maui, HI  96793
                            Telephone: (808)298-8633

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES FOR GOVERNMENT:

HANNAH KASTENBAUM
  (By Mr. Miller)        17
  (By Mr. Huff)                 29

GARY MALONE
  (By Ms. Reinitz)       40


EXHIBITS:                          Received

Government 1, 1A                      22
Government 2                          24, 39
Government 4                          65


                                    Page

Government's Argument                 68
Defendant Khalil's Argument           87

OCTOBER 31, 2023                                    10:50 A.M.

        THE COURT:  This is the pretrial motions hearing in the

case of United States v. Khalil and United States v Jaghama, 157

of 2023.  I have just conferenced with counsel.  We are all ready

to proceed.  There are some witnesses that will testify live

today, and there are also documents and other types of evidence,

such as tape recordings, that I believe will be entered into the

record.  We're ready to address all of those in turn.

        And I'd like to start by addressing one issue that has

become clear to me, and that is Mr. Khalil has never indicated

that he needed the services of an interpreter.  I'd like to deal

with that on the record right now.  And we have Mr. Khalil here,

sitting next to his counsel.  Mr. Khalil, I'm going to ask you to

rise to be sworn in.  Not to testify about the case, but about

this issue.

        THE CLERK:  Please raise your right hand.

    AL-ASHRAF KHALIL, DEFENDANT, SWORN

        THE CLERK:  Please state your full name and spell your

last name for the record.

        DEFENDANT KHALIL:  Al-Ashraf Khalil.

        THE COURT:  Thank you.  Please be seated.

        Mr. Khalil, how much English do you understand and

know?

        DEFENDANT KHALIL:  Understand enough, but there's

specific words like -- like specific words I need to understand

1    it, like morel.

2         THE COURT:  And what have you done to understand more?

3    As you have been charged, you went before a Magistrate Judge.

4    You've been in conversations and conferences with law

5    enforcement.  What have you done to express that you needed an

6    interpreter, or didn't you ever do that?

7         DEFENDANT KHALIL:  Like why I asked -- why I asked for,

8    like an, interputer (phonetic) --

9         THE COURT:  Interpreter.

10        MR. PERUTO:  If I may, Judge.  He doesn't need an

11   interpreter.  But I would ask that if he pulls on my sleeve --

12   during the proffer, there were some words he needed explaining,

13   but he doesn't need an interpreter for the whole thing, which

14   slows it up.  So if he just pulls on my sleeve, if something

15   needs to be explained more, I'll stand up and advise the Court.

16        DEFENDANT KHALIL:  Exactly.

17        THE COURT:  And we have an interpreter here, correct?

18        MR. PERUTO:  Two.  Yeah.

19        THE INTERPRETER:  We have an extra.

20        THE COURT:  It's fine by me if you use the interpreter.

21        DEFENDANT KHALIL:  No, it's better if Mr. Chuck --

22        THE COURT:  You can't have it both ways, sir.

23        MR. PERUTO:  He's not asking for one.

24        THE COURT:  Because you can't say you don't understand

25   and then say no to an interpreter.  You've been doing that all

1  along, and I'm not going to let you do it today, okay?  If you

2  don't understand one word, you need an interpreter.  We are here

3  to make sure everything is clear for you?

4  DEFENDANT KHALIL:  Okay, Your Honor.

5  THE COURT:  It's not your choice.

6  DEFENDANT KHALIL:  Okay, Your Honor.

7  THE COURT:  So let's just take a recess.  I am going to

8  ask him to be wired up, and maybe you want to change your seat, I

9  don't know.  But I do think that the evidence should show that

10  Defendant Jaghama is using the services of an interpreter already

11  and that this is certainly not a hindrance to us proceeding this

12  morning.

13  THE INTERPRETER:  Your Honor, we don't need to move.

14  And we can test now that he can hear us.

15  DEFENDANT KHALIL:  Yes, I do.

16  MR. PERUTO:  There's two if you want to use the other

17  one.

18  DEFENDANT KHALIL:  Yeah.

19  THE COURT:  If there is simultaneous need, such as both

20  Defendants would require an interpreted conference with their own

21  lawyers, of course, you will be separating, and that's why two

22  are here.

23  THE INTERPRETER:  Yes.  Yes.

24  THE COURT:  And I agree.  So let's -- since the wiring

25  up has been done, it seemed very easy.  Thank you.  I would like

1   to start now by having both of our interpreters stand to be sworn

2   in.

3       INTERPRETERS RAMEZ ZAKHARY AND GHADDA ATTIEH, SWORN

4       THE CLERK:  Please take your full name and spell your

5   last name for the record.

6       INTERPRETER ZAKHARY:  Ramez Zakhary. R-A-M-E-Z Z-A-K-H-

7   A-R-Y.

8       INTERPRETER ATTIEH:  Ghada Attieh.  G-H-A-D-A A-T-T-I-

9   E-H.

10      THE COURT:  Thank you.  Please be seated.

11      INTERPRETER ZAKHARY:  Thank you.

12      THE COURT:  Now, with that accomplished, I would like

13  the Government first to outline -- I was handed additional

14  exhibits this morning through my Deputy, and these will be

15  addressed in your arguments and testimony; is that correct?

16      MS. REINITZ:  Your Honor, those exhibits relate to

17  testimony that will occur today.  Items 1, 1-A, and 2 relate to

18  the medical examiner who will testify.  Exhibit 3 is a recording.

19  And Exhibit 4 is a picture that will be shown to Special Agent

20  Malone.

21      THE COURT:  Thank you.  Now, as to how we proceed, we

22  do have a very large issue to address today, and that's the

23  causation standard of the charge, Section 18, United States Code,

24  Section 844(i).  There is precedent and analogous statutes, but

25  not as clear precedent as we would all like, so we're here to

1  address it as it specifically relates to this case and this jury

2  trial.  And the pretrial motions that have been filed on Mr.

3  Khalil's behalf, motions to dismiss Counts 1 and 2.  There's also

4  a motion to join in that motion.  Is that correct, Mr. Huff.

5            MR. HUFF:  That is correct, Your Honor.  Thank you.

6            THE COURT:  We're granting that.  We don't see any

7  prejudice to the Government.  The arguments are the same, and

8  they have responded.  So that much we can handle together.

9            And then there is the Government's motion in limine to

10 exclude improper defenses.  And then there's Mr. Khalil's motion

11 to suppress his statements during an ATF interview.  Then there

12 is Mr. Jaghama's motion to exclude evidence of arsonist

13 reputation and Mr. Jaghama's motion to sever trials.

14            Are there any other motions that we are to address

15 today?

16            MS. REINITZ:  No, Your Honor.

17            MR. PERUTO:  Not from the Defense.

18            MR. HUFF:  No, Your Honor.  Thank you.

19            THE COURT:  Very good.

20            Let's start out where the heavy legal analysis is so

21 important, and that's Mr. Khalil's motion to dismiss Counts 1 and

22 2.  I would like you to tell me, Mr. Peruto, you made this

23 motion.  Tell me what the basis of this motion is about.

24            MR. PERUTO:  Well, Judge, it is causation, and it is

25 foreseeability.  My client concedes, for purposes of the motion

1  which we already put in writing, that the evidence will show that

2  he agreed to set fire to a business that he owns.  We are arguing

3  that that does not mean he's responsible for the death of the

4  firefighter, for this reason, and in short.

5          As Brady material, I was furnished by the Government, a

6  firefighter said to the district commander, this building is

7  going to collapse.  We have to get everybody out.  It's going to

8  collapse.  They did not issue the order to get everyone out.

9  Thereafter, the building collapsed, killing the firefighter.  I

10 want to be able to argue that had they followed their own

11 protocol, that had they acted with that prudence, that we

12 wouldn't have the death of this firefighter, and it's an

13 intervening cause.

14          Yes, it's foreseeable that firefighters will come to

15 put out a fire.  We all agree with that.  But it is not

16 foreseeable that they would be ordered to stay in a burning

17 building where the load has shifted and the building is

18 collapsing, where it could be heard that it's collapsing with the

19 timber breaking and the movement of the building.  And,

20 therefore, we need to be able to argue that he is not responsible

21 because of that intervening cause.

22          THE COURT:  Even though he admits to setting the fire?

23          MR. PERUTO:  He admits to setting the fire.

24          THE COURT:  So nothing flows from that?

25          MR. PERUTO:  Oh, if they were not on notice that the

1    building is going to collapse, then we wouldn't be able to argue

2    that.  But here we have a firefighter who just left the interior

3    of the building, and said, we got to get everybody out.  That

4    changes things.  I want to be at least able to argue to the jury,

5    they may be free to reject it, but to argue to the jury that they

6    should have removed everyone, with their experience and protocol,

7    to remove every firefighter from that building because it's going

8    to collapse, and that's really as honed in as I can make this

9    issue.

10            THE COURT:  Let me ask you a question or two, though.

11   Because does direct mean to the Defense actual cause, meaning but

12   for causation?  Is that what you're saying?

13            MR. PERUTO:  I don't think you could use but for

14   causation.

15            THE COURT:  So can't the Government prove the sentence

16   enhancement?  That's what we're talking about here.  Not the

17   arson, but the sentence enhancement only by establishing but for

18   causation?

19            MR. PERUTO:  Yes, they can.

20            THE COURT:  Okay.  You think they can?  Well, doesn't

21   that can the argument then?

22            MR. PERUTO:  Not in my opinion.  It still allows us to

23   have a jury decide all questions of fact.

24            THE COURT:  You see, what you're talking about is a

25   fact that you know through disclosure and discovery labeled as

1   Brady that says we've got to get out of here, but they hadn't

2   left yet.  So there's questions of timing.  There's questions of

3   notice.  There's questions of who in authority gave that.

4   There's all kinds of questions that I don't have the answers to.

5   We would hear that at trial, I'm sure, but why would we hear that

6   at trial?  Because -- are you going to argue at trial that the

7   building might have collapsed on its own that night --

8          MR. PERUTO:  Yes.

9          THE COURT:  -- even if it had not been set on fire?

10          MR. PERUTO:  Yes.  This building was in danger of

11   collapse without a fire.

12          THE COURT:  But he went ahead and set arson to it.

13          MR. PERUTO:  Yes, he did.

14          THE COURT:  He confesses, allegedly.  And he knew that

15   it was unstable.

16          MR. PERUTO:  Yes, he did.

17          THE COURT:  I don't know.  Coming and going doesn't

18   seem so easy to say.  The firefighters wouldn't have had it

19   collapse on them had they just not gone in there.

20          MR. PERUTO:  Well, I'm not saying they shouldn't go in.

21   I'm saying that they should have come out when it was apparent,

22   at least to one firefighter who was in there, get everybody out.

23          THE COURT:  Does everybody out mean, in your Brady

24   disclosure, which I don't know what it says, that we know that

25   there had been rented apartments in the upper levels of this

1  building?

2        MR. PERUTO:  Yes.

3        THE COURT:  And they included those tenants in get

4  everybody out?  I don't know.

5        MR. PERUTO:  They were already out.

6        THE COURT:  Everybody was out of the building?

7        MR. PERUTO:  Yes.  All civilians were out.

8        THE COURT:  Okay.  And everything was happening on a

9  timeline that was not that long?

10        MR. PERUTO:  No.  Agreed.

11        THE COURT:  So it was pretty quick?

12        MR. PERUTO:  Yes.

13        THE COURT:  Okay.  How about your defense and your

14  arguments about the building's preexisting structural issues that

15  you say you can prove that it would have collapsed anyway and the

16  firefighter's supposed negligence, which would lead to a mini

17  trial within this trial, wouldn't that further confuse the jury?

18        MR. PERUTO:  Well, all issues raised have the potential

19  to confuse a jury.  But in this particular case, if a building

20  was going to collapse anyway without a fire, a jury needs to hear

21  that because it's a question of fact they have to decide.

22        THE COURT:  Let me go back to something you said

23  earlier, Mr. Peruto.

24        MR. PERUTO:  Okay.

25        THE COURT:  Even assuming foreseeability is the

1　standard here, just assume it, why is any of this evidence that

2　you're proposing probative?  Is it really unforeseeable that a

3　building that has been set on fire would lose its structural

4　integrity?

5　　　　　MR. PERUTO:  No, that's not unforeseeable.

6　　　　　THE COURT:  Can you provide additional details about

7　what arguments and evidence you would present regarding this

8　building's preexisting issues?

9　　　　　MR. PERUTO:  Civilians of my client's family who had

10　been in the building and the tenants of Star Pizza, all of whom

11　have heard the cracks and the waving of the building.

12　　　　　THE COURT:  But everybody's been living there anyway?

13　　　　　MR. PERUTO:  Yes.

14　　　　　THE COURT:  Business, commerce has taken place anyway?

15　　　　　MR. PERUTO:  Yes.

16　　　　　THE COURT:  So nobody took that very seriously, did

17　they?

18　　　　　MR. PERUTO:  Judge, he took it seriously enough that he

19　wanted to burn it down because he couldn't sell it because of

20　those issues.

21　　　　　THE COURT:  All right.  Tell me more about how you

22　think the first responders were negligent.

23　　　　　MR. PERUTO:  Not all first responders were negligent,

24　of course.  The commander, in not adhering to the wishes of the

25　firefighter that he sent in when he came out and said, you got to

1   get everybody out, the building is collapsing, or I believe in

2   imminent danger of collapse.  I can't remember the exact words,

3   but it conveyed the message, and they didn't remove the

4   firefighters.

5           THE COURT:  So that's the basis of the decisions that

6   you think broke this chain of causation that otherwise looks

7   pretty clear?

8           MR. PERUTO:  Yes.

9           THE COURT:  Okay.

10          MR. STEIN:  Judge, can I --

11          MR. PERUTO:  That's something we could point to.

12  That's something we could point to.

13          MR. STEIN:  May I just give you a direct quote from the

14  Government's engineering report --

15          THE COURT:  Yes.

16          MR. STEIN:  -- which, based on the engineering report,

17  examined the condition of the building based on viewing

18  photographs, et cetera, that existed prior to the fire and

19  subsequently.  And there is a reference to Lieutenant Williams,

20  who was part of the original response to the scene, who said he

21  noticed bulging in the wall, in the east wall, and on another

22  wall he saw a crack.

23          At one point, he said it appeared at the ground level,

24  maybe a car had hit it in the pass.  And then he -- I'm not

25  reading every single line, but he goes on to say he and his crew

were not on the scene for very long, although it was part of the

original response. This is Lieutenant Williams. And prior to

departing, he stated he told the incident command that he thought

the building wasn't in good shape and they should get out

quickly, not spend a lot of time inside the building.

That's a quote, in the Government's engineering report,

and I think we should be allowed to present, as part of a

defense, that there was a very, very serious mistake in judgment.

You want to call it malfeasance, whatever you want to call it, in

going into a building where there were no people, no occupants in

that building, and going in there when it was quite clear that

there was a danger of that building collapsing.

So we think we should be entitled to present that as a

defense in this case to the element of the crime because the

death of the fireman is actually an element of the Government's

case, and we should be entitled and not limited in our ability to

challenge that element of the crime, which the Government has to

prove beyond a reasonable doubt. And the statute itself talks

about proximate cause and direct cause.

So I think it would be unfair to the defense if we were

not allowed to present that as a response and a defense to one of

the elements of the crime, because that element increases the

maximum penalty. And as we all know, that has to be proven

beyond a reasonable doubt.

THE COURT: All right. Thank you, Mr. Stein.

1           Let me go back to another question I have about the

2   actual motion, and that's just for argument's sake, let's assume

3   that I would agree with the Defense that direct or proximate

4   modifies the word death in the statute, not duties.  Then explain

5   to me why this statute says direct or proximate?  Doesn't that

6   suggest there are two alternative avenues to prove this

7   enhancement?

8           MR. STEIN:  It does.  Clearly it does.  It's the plain

9   language of the statute.

10          THE COURT:  Plain language, which is a little

11  confusing, but --

12          MR. STEIN:  Yes.

13          THE COURT:  -- still plain enough.  Okay.  All right.

14  You stood up as if you wanted to argue something.

15          MR. PERUTO:  No, Judge, I stood up because when the

16  Court looks at me, I stand up.

17          THE COURT:  Thank you, Mr. Peruto.

18          Anything else you'd like to argue on the motion to

19  dismiss Counts 1 and 2, Mr. Peruto?

20          MR. PERUTO:  Just that there was other evidence of a

21  lesser nature indicating it was going to collapse.  That was the

22  chief piece of evidence.

23          THE COURT:  All right.  I'm going to ask the Government

24  to argue and put on whatever evidence you think you need to

25  address this issue.

1          MS. REINITZ:  Your Honor, we'll begin by calling our

2     witnesses and then address the arguments of the Court --

3          THE COURT:  All right.

4          MS. REINITZ:  -- if that's okay.

5          All right.  We'll call Dr. Hannah Kastenbaum, Your

6     Honor.

7       HANNAH KASTENBAUM, GOVERNMENT'S WITNESS, SWORN

8          THE CLERK:  Please state your full name and spell your

9     last name for the record.

10         THE WITNESS:  Hannah Kastenbaum, K-A-S-T-E-N-B-A-U-M.

11         THE COURT:  Please be seated.  Thank you.  Please

12    proceed.

13         MR. MILLER:  Thank you, Your Honor.

14                        DIRECT EXAMINATION

15    BY MR. MILLER:

16    Q    Good morning, Doctor.

17    A    Good morning.

18    Q    Are you currently employed?

19    A    Yes.

20    Q    Could you tell the Court where you work?

21    A    I work for the City Medical Examiner's Office.

22    Q    And what's your position there?

23    A    I'm an associate medical examiner.

24    Q    And could you briefly explain to the Court what you do in

25    that role?

1  A    So I am a physician who is trained as a forensic

2  pathologist.  And in that capacity, I've been hired by the City.

3  The Medical Examiner's Office is required for investigating and

4  certifying cause and manner of death in a subset of citizens of

5  the city.

6  Q    Could you summarize your educational background?

7  A    I have a bachelor's degree in biology from the University of

8  Rochester, a medical degree from Jefferson Medical College, which

9  is now Sydney Kimmel Medical College.  I am trained in anatomic

10 and clinical pathology at the University of Pittsburgh Medical

11 Center.  I am also board certified in both.  And then I did a one

12 year forensic pathology fellowship at the University of New

13 Mexico, and I am board certified in that as well.

14 Q    When did you first begin working as a medical examiner?

15 A    August 1, 2012.

16 Q    Okay.  And was that in Philadelphia or somewhere else?

17 A    Somewhere else.

18 Q    Where did you work initially?

19 A    At the State Office of the Medical Investigator, which is a

20 statewide medical examiner system in the State of New Mexico.

21 Q    And while you were in New Mexico, in addition to being the

22 medical examiner, did you teach at any medical schools?

23 A    Yes.  The office was affiliated with the University of New

24 Mexico School of Medicine, so I was part of their pathology

25 department.

1   Q    And when did you begin working as a medical examiner in

2   Philadelphia?

3   A    December of 2019.

4        MR. MILLER:  Your Honor, for the record, there's a

5   stipulation between all the parties that the witness is qualified

6   to testify for purposes of today's hearing as an expert in the

7   field of forensic pathology.

8        MR. HUFF:  Agreed, Judge.

9        MR. PERUTO:  So stipulated.

10       THE COURT:  Thank you.  I accept that stipulation.

11       MR. MILLER:  Thank you, Your Honor.

12       THE COURT:  And you may proceed to ask the witness

13  questions about her testimony.

14       MR. MILLER:  Okay.  Briefly, Your Honor, may I approach

15  the witness?

16  BY MR. MILLER:

17  Q    Do you see Exhibit 1 in front of you?

18  A    Yes.

19  Q    Is that your CV?

20  A    Yes.

21  Q    And does it accurately reflect your education,

22  qualifications, and training?

23  A    Yes.

24  Q    Okay.  Now, turning to this case.  As part of your job

25  duties, did you ever examine the deceased body of Philadelphia

1    Fire Lieutenant Sean Williamson?

2    A    Yes.

3    Q    Could you approximate how long after Lieutenant Williamson's

4    death your examination occurred?

5    A    I believe it was the following day.

6    Q    Okay.  Did you receive any information about his go prior to

7    your examination?

8    A    Yes.

9         MR. STEIN:  We usually receive some limited information

10   about the circumstances of somebody's death that allows the

11   investigators to make a call as to whether or not said death

12   falls under the office's jurisdiction and then gives me or the

13   other pathologist some context as to what we're doing, what we

14   might be looking for on exam.

15   Q    In this case, what did you learn prior to your examination?

16   A    That Lieutenant Williamson was on duty with the fire

17   department.  They responded to a structure fire, and in the

18   course of such response, Lieutenant Williamson was inside the

19   building when it collapsed.

20   Q    Okay.  Now, when you began examining Lieutenant Williamson's

21   body, could you briefly explain to the Court what you did during

22   that examination?

23   A    So the examination includes a complete review of a decedent

24   from the outside inwards, including how they're received in the

25   office.  So Lieutenant Williamson was dressed in all of his

1  firefighting gear that's documented in photographs.  Then he is

2  undressed, and the entirety of the outside of his body is

3  examined.  And then we proceed -- I apologize.  The external

4  examination includes photographs, may include X rays.  And then

5  we proceed with the internal examination.

6       So the body is incised in a Y shaped incision.  The anterior

7  portion of the ribs are removed, and so now we can see all of the

8  chest, abdominal and pelvic organs insitu or as they sit.  The

9  skull is also open, so we can view the brain and remove it and

10 examine it.  All of the organs are removed and examined in turn.

11 Q    Do you see Exhibit 1-A under exhibit one?

12 A    Yes.

13 Q    Okay.  What is that document?

14 A    So this looks like the packet of reports.  So first is the

15 findings and opinions page, which I write.  It's two pages.  Next

16 comes the report of examination, which is the full narrative

17 description of the autopsy and my findings during the autopsy.

18 Lastly, is the toxicology report, which is issued by the

19 Toxicology Laboratory.  That's part of our office.

20 Q    Does Exhibit 1-A set forth your analysis and conclusions

21 with respect to the work you did in this case?

22 A    Yes.

23         MR. MILLER:  Okay.  Your Honor, I move for the

24 admission of Exhibits 1 and 1-A.

25         MR. HUFF:  No objection.

1      MR. PERUTO:  No objection, Your Honor.  Thank you.

2      THE COURT:  1-A and 1 are both admitted.

3      (Government's Exhibits 1 and 1-Aadmitted in evidence)

4   BY MR. MILLER:

5   Q    If you turn to page 2 of Exhibit 1-A, did you form an

6   opinion as to the cause of the Lieutenant's death?

7   A    Yes.

8   Q    And what was your opinion as to his cause of death?

9   A    Mechanical asphyxia due to entrapment in debris from

10  collapsed building after fire.

11  Q    Okay.  And if someone were to ask you how to explain

12  mechanical asphyxia in more everyday English, how would you

13  describe it to a layperson?

14  A    So asphyxia is insufficient supply of oxygen to the body,

15  the tissues, the organs.  So it's a lack of oxygen.  And then

16  mechanical refers to sort of how that occurs.  So in Lieutenant

17  Williamson's case, mechanical -- well, in any case, mechanical

18  asphyxia is an inability of the body to take in air containing

19  oxygen because of some limitation of the body's function by an

20  outside force or action.

21  Q    Okay.  Would it be a fair summary to say that Lieutenant

22  Williamson died because he couldn't breathe?

23  A    Yes.

24  Q    Okay.  Now, going back to page 1, Roman numeral I, does that

25  again set forth the Lieutenant's cause of death?

1   A    Yes.

2   Q    Okay.  And then lines A through G underneath Roman numeral

3   I, what is set forth there?

4   A    So those are findings in either my examination of Lieutenant

5   Williamson or ancillary studies or ancillary information from

6   other agencies that support the diagnosis or determination in

7   Roman numeral I.

8   Q    Okay.  Are they bases for your conclusion as to his cause of

9   death?

10  A    Yes.

11  Q    Looking at line A, what does it mean that the Lieutenant had

12  a purple suffusion on his upper chest, face and scalp?

13  A    His skin, and you can see it in his sclera or the whites of

14  his eyes are purple and congested.  So the blood flow is -- or

15  the blood flow out of those parts of his body is impaired.

16  Q    Did you take pictures showing the purple suffusion?

17  A    Yes.

18  Q    Do you see Exhibit 2 in front of you?

19  A    Yes.

20  Q    Could you explain to the Court what that picture shows?

21  A    So this picture shows Lieutenant Williamson's head, neck,

22  and sort of upper chest.  His face and scalp and upper chest are

23  markedly purple, particularly around his eyes.  Yeah.

24  Q    And you took this during your examination?

25  A    One of the autopsy technicians would have taken the photo,

1    but I was there.  Yes.

2    Q    It accurately reflects how he looked?

3    A    Yes.

4              MR. MILLER:  Your Honor, I would move to admit Exhibit

5    2.

6              MR. PERUTO:  No objection, Judge.

7              THE COURT:  It's admitted.

8         (Government's Exhibit 2 admitted in evidence)

9    BY MR. MILLER:

10   Q    Could you explain to the Court how the purple suffusion

11   depicted in this exhibit impacted your conclusion as to the

12   Lieutenant's cause of death?

13   A    So the purple suffusion suggests that venous return or blood

14   coming back to the heart from the upper half or upper portion of

15   Lieutenant Williamson's body, his chest, his head and neck, is

16   impaired.  So the pooling of blood in those tissues makes them

17   look purple.

18   Q    Okay.

19   A    And this also happens if -- why it's venous return to

20   Lieutenant Williamson's heart impaired, and that comes back to

21   the cause of his mechanical asphyxia, which is just the sheer

22   weight of the debris from a collapsed building sitting on top of

23   him.

24        So not only is it impairing his ability to inhale, to get

25   oxygen and air into his body, but also it's slowing venous return

1    from the head and chest to back to the heart.

2    Q    And the weight of the debris would cause that?

3    A    So the weight of the debris on Lieutenant Williamson's

4    remains on his body would impair his ability to take a deep

5    breath.  Meaning how do we take a deep breath?  So, two ways.

6    The rib cage expands using the intercostal muscles or the muscles

7    between the ribs, and that creates negative pressure in the

8    chest, so it pulls air in through the airways.  It also helps

9    venous return to the heart, which also sits in the chest cavity.

10        So expansion of the ribs.  Also, the other mechanism is that

11   the diaphragm, which is a thin muscle that separates the chest

12   cavity from the abdominal cavity lowers.  It kind of drops out.

13   So again, it creates negative pressure or sucking into the chest

14   cavity to get air in through the airways.  Also, to get blood

15   back from the peripheral parts of the body to the heart and the

16   chest.

17   Q    If you look at lines B and C on page 1, and you've written

18   bilateral scleral hemorrhage and -- well, why don't you, because

19   you pronounce it better than I can.  What did you note in item --

20   in lines B and C?

21   A    So line B says bilateral scleral hemorrhage, as you said,

22   and the sclera are the whites of the eyes.  So why is there a

23   hemorrhage there?  Because the small blood vessels have burst,

24   again, because of an increase of pressure in those blood vessels

25   because the blood doesn't drain back into larger blood vessels

1  back down to the chest.

2      Line C says hemorrhage into the intercostal musculature in

3  posterior right trunk.  So part of my examination of Lieutenant

4  Williamson included -- I don't mean to be crass, but I peeled the

5  skin and subcutaneous fat from the back of his body to look at

6  the muscles in his back, in his extremities, et cetera.

7      And so then I can get a look at the intercostal muscles, the

8  back muscles, and there is leakage of blood into those muscles in

9  the posterior right chest or the right back.  And that is

10 evidence of some blunt injury.  So, again, I think that is from

11 the weight of the debris sitting upon him.

12 Q    Thank you, Doctor.

13 A    You're welcome.

14 Q    If we look at Lines D and E, where did Lieutenant Williamson

15 suffer abrasions and contusions on his body?

16 A    There were abrasions on his upper arms, his right abdomen

17 and his left shoulder, and a contusion on his anterior right

18 thigh.

19 Q    And what, if any, role did your observation of those

20 abrasions and that contusion have in your determination of his

21 cause of death?

22 A    So an abrasion is a scrape.  Contusion is a bruise.  So

23 these are superficial blunt injuries.  So, again, links back to

24 just the sheer weight of debris sitting on Lieutenant Williamson.

25 Q    And then if we look at line F, do you see where it says

1    carbon monoxide level equals 0 percent?

2    A    Yes.

3    Q    Could you explain to the Court why, if at all, his carbon

4    monoxide level, you found that to be significant?

5    A    So we got the information, as we mentioned a few minutes

6    ago, that Lieutenant Williamson was at site of a fire when he

7    died.  So one of our concerns when evaluating people who die at

8    the site of structure fires is exposure to byproducts of that

9    fire.  Carbon monoxide being one of them, are sort of the most

10   significant.

11        So we can do that testing.  We have an instrument in the

12   morgue.  We can do that testing basically at the tableside.  And

13   so I did that that day.  And his carbon monoxide level is zero,

14   which means he's not dying as a result of the acute fire putting

15   gases into the environment.

16   Q    Okay.  In other words, he did not die from what he breathed

17   in?

18   A    Correct.

19   Q    During your evaluation, did you discover whether the

20   Lieutenant had any heart issue at the time of his death?

21   A    Yes.

22   Q    And is that documented on page 1?

23   A    Yes.

24   Q    Do you believe his heart condition caused his death?

25   A    No.

1   Q    And why do you believe that?

2   A    Because the circumstances -- circumstances, pardon me, under

3   which Lieutenant Williamson died trump his underlying heart

4   disease.  They take precedence.

5   Q    And if we look at Exhibit 2, the photograph that was taken

6   of the Lieutenant, if he had died of a heart attack, would you

7   expect to -- that was his primary cause of death, would you

8   expect to see purple suffusion on his body to the extent it's

9   present on Exhibit 2?

10  A    So, no.  You might still see some purple perfusion of the

11  chest and upper part of the body, again, because venous return to

12  the heart is impaired.  But in the example, when that is

13  happening due to heart disease, it's less marked than this, it's

14  more mild.  Yeah.

15  Q    In your opinion, did anything other than mechanical asphyxia

16  cause Lieutenant Williamson to die?

17  A    No.

18  Q    And if he had been wearing an oxygen mask when the building

19  collapsed on him, would that have altered the outcome in this

20  case?

21  A    No.

22  Q    Could you explain to the Court why it would not have altered

23  the outcome?

24  A    So, as I mentioned, mechanical asphyxia is the inability of

25  a person to take a deep breath to take in the air.  So it doesn't

1    matter what's in the air around you if you can't get it into your

2    body.  So whether it's oxygen mask and it's some higher

3    percentage of oxygen, if you can't expand your chest to take a

4    deep breath, it doesn't matter.

5              MR. MILLER:  No further questions, Your Honor.

6              THE COURT:  Any cross-examination, Mr. Peruto?

7              MR. PERUTO:  I have none.

8              THE COURT:  Mr. Huff?

9              MR. HUFF:  Judge, I would like to ask some questions.

10             THE COURT:  Please.

11                        CROSS-EXAMINATION

12   BY MR. HUFF:

13   Q    Good morning, Doctor.

14   A    Good morning.

15   Q    Doctor, on page 3 of the report, it's the first page of the

16   report of examination, Government Exhibit 1-A?

17   A    Yes.

18   Q    All right.  You have an external examination there, correct?

19   A    Yes.

20   Q    All right.  And you note during the external examination

21   that Lieutenant Williamson was five foot six, correct?

22   A    Yes.

23   Q    245 pounds, correct?

24   A    Yes.

25   Q    Okay.  So would that be considered medically obese?

A    Yes.  His body mass index, which, if you continue to read that sentence, is 39.5, and a BMI over 30, is considered medically obese.

Q    Okay.  And then it says, Caucasian man who appears the reported age of 81 years?

A    That's a typo.  He was 51.

Q    Okay.

A    I apologize.

Q    So his obesity wasn't that of an 81-year-old?

A    No.

Q    Okay.  So that's a mistake in your report?

A    Yes.

Q    Okay.  And on the first page of the findings and opinions, you also list the age, height, and weight of the individua; is that correct?

A    Yes.

Q    Those are relevant factors for a medical examiner to consider in determining the cause and manner of death; isn't that correct?

A    Yes.

Q    So much so that you listed also on that front page under Roman numeral III, hypertensive cardiovascular disease; s that correct?

A    Please -- I don't understand your question.  I'm sorry.

A    Sure.  I'm assuming that when you write these reports,

1  you're including relevant information?

2  A     Yes.

3  Q     Important information?

4  A     Yes.

5  Q     Medical information?

6  A     Yes.

7  Q     And you included that Lieutenant Williamson was obese,

8  correct?

9  A     Yes.

10  Q     And also that he was suffering from hypertensive

11  cardiovascular disease, correct?

12  A     Yes.

13  Q     Because those are relevant factors in determining the cause

14  of death, correct?

15  A     Because they were significant findings at his autopsy.

16  Q     Right.  Significant.

17  A     Yes.

18  Q     Okay.  You wouldn't have listed them if they weren't

19  important or significant, correct?

20  A     Correct.

21  Q     All right.  Now, is the hypertensive cardiovascular disease

22  caused in part or in full by obesity?

23  A     It can be related, yes.

24  Q     Okay.  And in this case, would you say that they were

25  related?

1   A    I mean, in that he has both, yes.

2   Q    Okay.  And cardiovascular disease is essentially high blood

3  pressure or hypertension?

4   A    So cardiovascular disease, that phrase, just refers to heart

5  disease.

6   Q    Okay.

7   A    Or disease of the heart and the blood vessels, and then it's

8  the hypertensive that refers to high blood pressure.

9   Q    Okay.  And is it the hypertensive high blood pressure that

10  causes the disease?

11   A    Yes.

12   Q    Okay.  And individuals who suffer from hypertensive

13  cardiovascular disease, does that affect their ability to

14  breathe?

15   A    No.

16   Q    Okay.  What does -- How does it affect an individual?  It

17  has something to do with the heart, correct?

18   A    Yes.  So individuals with high blood pressure, their heart

19  has to work harder to pump blood against that pressure so that

20  blood, which carries oxygen and other nutrients, gets out to the

21  organs of the body so that the organs of the body can continue to

22  live and function, most importantly, the heart and the brain.

23   Q    Okay.  So if an individual was obese and suffering from

24  hypertensive cardiovascular disease, you wouldn't expect them to

25  be running a marathon; is that correct?

1    A    I mean, I can't make that assessment.

2    Q    Okay.

3    A    I don't personally run marathons.

4    Q    Would it be harder for that person?

5    A    I believe so, yes.

6    Q    And because it would be harder for them to breathe, right?

7    A    Because it would be harder for their pump -- for their heart

8    to supply enough blood carrying oxygen to their organs.

9    Q    Right.

10   A    You would be working much harder because it's working much

11   harder at baseline, never mind during a period of exercise.

12   Q    Okay.  And like you said, it carries oxygen, correct?

13   A    Yes.

14   Q    Oxygen is what we get from breathing, correct?

15   A    Yes.

16   Q    Okay.  Now, I understand that your opinion is that it was

17   the weight of the debris that caused Lieutenant Williamson not to

18   be able to breath;, is that correct?

19   A    Yes.

20   Q    All right.  Now, you did note, as was pointed out on direct

21   examination, that he suffered abrasions or cuts to his upper

22   arms, abdomen and shoulder; is that correct?

23   A    Abrasions are scrapes, not cuts.  Cuts.  Pardon me.  Using

24   the term cut suggests a sharp force injury --

25   Q    Okay.

1    A    -- which is just a different category.

2    Q    All right.  I'll say scrapes then.  He had scrapes?

3    A    Yes.

4    Q    All right.  And you also said a single contusion to the

5    right anterior thigh; is that correct?

6    A    Yes.

7    Q    All right.  And I'm assuming your opinion would be that he

8    suffered those abrasions and contusions as a result of the

9    debris?

10   A    Yes.

11   Q    All right.  Ther was no broken -- he didn't break any arm?

12   His arms were not broken or as a result of this incident; is that

13   correct?

14   A    Correct.

15   Q    No broken legs?

16   A    Correct.

17   Q    No broken ribs?

18   A    Correct.

19   Q    All right.  No spinal injury, correct?

20   A    Correct.

21   Q    Okay.  And those might be things you might normally see if

22   someone had, you know, had debris fallen on them during a --

23   A    They might, yes.

24   Q    Okay.  All right. But they were not found in this case.  You

25   agree with that, correct?

1  A    I agree.

2  Q    Okay.  You also said that the cause of death was not related

3  to carbon monoxide; is that correct?

4  A    Correct.

5  Q    And carbon monoxide would be essentially breathing in the

6  smoke related to the fire, is that correct?

7  A    So carbon monoxide is in the smoke from fires.  It's a

8  byproduct of things being burnt.

9  Q    And that would prohibit oxygen from getting into the lungs,

10  is that correct?

11  A    It won't prohibit oxygen from getting into the lung, but it

12  does interfere with red blood cells ability to pick up oxygen in

13  the lungs and transport it around the body.

14  Q    And in this case, you said that it was a zero amount of

15  carbon monoxide; is that correct?

16  A    Yes.

17  Q    All right.  So again, it was just the weight, allegedly, of

18  the debris that was the cause of death; is that correct?

19  A    Yes.

20  Q    Okay.  Do you know how long Lieutenant Williamson suffered

21  from hypertensive cardiovascular disease?

22  A    No.

23  Q    Okay.  You don't go back to his old medical records and see

24  how long he had had that diagnosis; is that correct?

25  A    Correct.

1    Q    You don't know how he was treating that?

2    A    Correct.  I don't know.

3    Q    You did a toxicology report, though; is that correct?

4    A    Yes.  It's the office's policy that toxicology studies are

5    performed on all of our patients.

6    Q    Right.  And that's the last page of Government Exhibit 1-A,

7    correct?

8    A    The last two pages, yes.

9    Q    Two pages.  Sorry.  And was there any controlled substance

10   that might indicate that Lieutenant Williamson was taking

11   medication for his hypertensive cardiovascular disease?

12   A    So there are no illicit substances detected.  And then I'm

13   looking at the classes of drugs.  So in the analysis notes, the

14   classes of drugs that this testing covers, because we don't cover

15   every substance that exists and is known to man, and I don't know

16   what antihypertensive medications would be covered.

17   Q    Okay.  So you don't have an answer to that.

18   A    So I don't -- so I can't answer that question.

19   Q    And just so I know, you said it was a two page report.

20   There's nothing contained on the second page of that report, is

21   there?

22   A    Correct.  It's just the end of Mr. Dunn, the chief

23   toxicologist's at the time, electronic signature at the top of

24   the page.  It ran over, but the results of the testing are all on

25   the first page.

1    Q    Thank you.

2            MR. HUFF:  All right.  I have no other questions.

3    Thank you, Your Honor.

4            THE COURT:  I do have a question, if I may intervene

5    here.  You said that initially when you started the examination,

6    he was fully clothed.

7            THE WITNESS:  Yes, ma'am.  Your Honor, I apologize.

8            THE COURT:  That's okay.  Would you describe the

9    clothing or the apparatus or anything that he was wearing when

10   you first saw him?

11           THE WITNESS:  As I recall, he's wearing heavy duty

12   pants, a shirt, boots.  Let's see, I listed it in my report, but

13   I don't go into a lot of detail.  Come on.  Shirt, shorts,

14   underwear, pants, socks, boots, gloves, and a belt is what he

15   comes in wearing.  I would have to look back at the intake photos

16   for more details.

17           THE COURT:  So that's the extent of his apparatus that

18   you got to witness?

19           THE WITNESS:  Yes, Your Honor.

20           THE COURT:  Okay.  Then I don't have any more questions

21   for you on that.  Back to 1-A, Roman numeral III, since there

22   were questions about it.  Hypertensive cardiovascular disease.

23   What does that topic mean when you list disease there?

24           THE WITNESS:  Heart disease due to high blood pressure.

25           THE COURT:  Okay.  Is that a finding?

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  But you say in sub E, no significant

3    coronary artery disease?

4          THE WITNESS:  So they're related but separate entities.

5    So coronary artery disease falls under the disease heading, or

6    could be another Roman numeral, if you had it, atherosclerotic

7    cardiovascular disease.  So heart disease due to atherosclerosis

8    or accumulation of lipids and scar tissue in blood vessels.

9          So, in particular, in looking at the arteries that

10   supply the heart muscle itself, his were clean.  So there's no

11   coronary artery disease.  It also relates to, one of the

12   attorneys mentioned, a heart attack.

13         So that is the typical reason people have heart

14   attacks.  The coronary arteries get narrowed by the deposition of

15   atherosclerotic material, lipids, et cetera, in the wall of the

16   blood vessel, and that interferes with the amount of blood

17   carrying oxygen that gets to the heart muscle, and the heart

18   muscle dies.  So he does not have any of that present.

19         THE COURT:  That's your findings?

20         THE WITNESS:  Yes, Your Honor.

21         THE COURT:  Thank you.

22         THE WITNESS:  You're welcome.

23         THE COURT:  Redirect, Mr. Miller?

24         MR. MILLER:  No, Your Honor.

25         MR. HUFF:  No, recross on that.

1          THE COURT:  Thank you very much.  You may step up.

2          THE WITNESS:  Thank you.  Where would you like the

3   exhibits?

4          MS. REINITZ:  I can take them.

5          THE COURT:  Did you wish to place G-2 into the record

6   of this hearing, Mr. Miller?

7          MR. MILLER:  Yes, Your Honor.  We would move all three

8   exhibits into the record.

9          THE COURT:  Yeah.  The first two have already been

10  admitted.  G-2 will also be admitted without objection.

11         MR. PERUTO:  No objection.

12         THE COURT:  I'm going to designate, though, that

13  because this is facing a jury trial, these exhibits will remain

14  under seal.  I don't want them open to public or juror scrutiny

15  before they even get to the Courtroom to be voir dired.  All

16  right.  And that's until further order of Court.  All right?

17         MR. MILLER:  Yes, Your Honor.

18      (Government's Exhibit G-2 admitted in evidence)

19         THE COURT:  What is the next witness?

20         MS. REINITZ:  Your Honor, at this time, the Government

21  will call Special Agent Gary Malone to address both the motion to

22  dismiss the indictment and the motion to suppress with Your

23  Honor's permission.

24         THE COURT:  Very well.

25      GARY MALONE, GOVERNMENT'S WITNESS, SWORN

1          THE CLERK:  Please state your full name and spell your

2    last name for the record.

3          THE WITNESS:  My name is Special Agent Gary Malone.  M-

4    A-L-O-N-E.

5          THE COURT:  Please proceed.

6          MS. REINITZ:  Thank you, Your Honor.

7                        DIRECT EXAMINATION

8    BY MS. REINITZ:

9    Q    Good morning, Agent Malone.

10   A    Good morning.

11   Q    Can you please tell the Court where you are currently

12   employed?

13   A    So I'm currently employed as a senior special agent for the

14   Bureau of Alcohol, Tobacco, Firearms and Explosives in the

15   Philadelphia Field Division, specifically in the Arson and

16   Explosives Task Force in Philadelphia.

17   Q    Okay.  And how long have you been with the ATF?

18   A    Approximately 19 years.

19   Q    And you said your current title is a senior special agent;

20   is that correct?

21   A    That's correct.

22   Q    How long have you been a senior special agent?

23   A    Approximately nine years.

24   Q    And prior to being a senior special agent, what was your

25   title?

1    A    I was just a special agent.

2    Q    Do you have any areas of expertise within your duties at the

3    ATF?

4    A    I am.  I am also a certified explosives specialist with the

5    ATF.

6    Q    Okay.  And you stated you're currently assigned to the arson

7    and explosives group of the ATF; is that correct?

8    A    That's correct.

9    Q    Is it fair to assume that those are the types of cases you

10   primarily investigate?

11   A    Correct.  My primary duty is to investigate fires and

12   explosions that occur in the Philadelphia area, as well as the

13   surrounding counties.

14   Q    And how long have you been investigating arson and explosive

15   cases?

16   A    Since 2014.

17   Q    Are you the lead case agent for the fire that occurred at

18   300 West Indiana Avenue in the early morning hours of June 18,

19   2022?

20   A    Yes, I am.

21   Q    And what kind of property was 300 West Indiana Avenue prior

22   to the fire and the eventual collapse of that building?

23   A    So, 300 West Indiana was a mixed use property.  It had

24   apartments on the second and third floor, and then the first

25   floor and the basement were associated with Star Pizza, Fish, and

1  Chicken, which was a commercial restaurant at the property.

2  Q    In the course of your investigation, have you reviewed

3  records provided by the Philadelphia Department of License and

4  Inspections, commonly known as LNI, for the 300 West Indiana

5  Avenue?

6  A    I have.

7  Q    And am I correct that LNI has provided more than 200 pages

8  of documents that relate to this building?

9  A    Yes, you are correct.

10 Q    Can you summarize what types of documents were contained in

11 the LNI production?

12 A    So there were two forms of documents.  There were those that

13 were associated with everything post June 18th, 2022, which was

14 post collapse.  Those types of documents were associated with

15 imminent danger, necessary demolition, cleanup type

16 documentation, along with engineering invoices for the actual

17 cleanup of the site.

18      Prior to that, there was documentations of violations

19 associated with food and restaurant type violations, such as, you

20 know, custodial situations in the restaurant, cooking hood type

21 fire violations, stuff associated with the actual cooking in a

22 restaurant.  But those were the two types of paperwork provided

23 by LNI.

24 Q    Was there anything in that paperwork indicating that the

25 Department of License and Inspections had found that 300 West

1    Indiana Avenue was in eminent danger or in danger of collapse

2    prior to the fire on June 18?

3    A    No, it did not.

4    Q    Okay.  Now based on your investigation, if we can move to

5    the day of the fire, June 18, 2022, why were there firefighters

6    and an LNI inspector inside 300 West Indiana Avenue at the time

7    of the collapse?

8    A    So the fire occurred in the early mornings or the early

9    morning of June 18th.  The initial main fire was extinguished.

10   Fire department personnel were conducting what are called

11   overhaul operations inside the building.  Pretty much in summary,

12   overhaul is searching for fire that is not readily seen.  So the

13   main fire is out, but they're looking for fire that might have

14   gotten in between the void spaces of walls, in the ceiling.

15       So the fire department are conducting searches by visually

16   looking at it, possibly opening up walls to look behind them to

17   see if any evidence of fire is occurring.  If they do see it,

18   they put water on it to extinguish any additional fire that may

19   be occurring.

20       Fire investigators are there during the overhaul process

21   because overhaul is inherently a destructive process.  So fire

22   investigators are there trying to get photographs early prior to

23   any destructive situations that could happen with overhaul.  And

24   LNI is there in order to assess the safety of the building during

25   all these operations.

1  Q    Okay.  So there was an LNI Inspector there --

2  A    Correct.

3  Q    -- to examine the safety of the building prior to allowing

4  people like tenants to return to the building, correct?

5  A    That's correct.

6  Q    Okay.  And it was during that time frame that the building

7  collapsed?

8  A    Correct.

9  Q    And based on your review of the evidence, was that a sudden

10  or a gradual collapse?

11  A    It appeared to be a very sudden collapse that occurred.

12  Q    Okay.  When did you become involved with the investigation

13  of the fire?

14  A    I was notified of the incident on June 18th.  I became

15  involved in earnest on June 19th.

16  Q    Okay.  Can you summarize how the investigation began on June

17  18th, 2022?

18  A    So on June 18th, members of the task force went out to the

19  scene in order to assist with recovery efforts during the

20  collapse, also in order to identify business owners, and property

21  owners, and tenants associated with the building itself, in order

22  to conduct subsequent interviews as the investigation went on.

23  On the 18th, one of the business owners was interviewed on scene

24  in a very short way, but it wasn't until the 19th that we

25  actually started conducting more formalized interviews with the

1   people associated with the entities of the building.

2   Q    Okay.  Agent Malone, can you explain to the Court what the

3   ATF National Response Team is and let the Court know if it was

4   activated in this case?

5   A    So the National Response Team is a national team made up of

6   certified fire investigators, certified explosive specialists

7   like myself, chemists, engineers, and agents from all over the

8   country that are activated to come into either bigger scenes or

9   more involved fire or explosive scene work.

10       In this case, on June 18th, after the collapse occurred, it

11  was determined, due to the size and scope of the scene, that the

12  National Response Team would be activated.  One of the mandates

13  of the team is to allow 24 hours for agents and investigators to

14  come in from all over the country.  So they started trickling in

15  on the 18th, but in earnest were here on the 19th as a total

16  team.

17  Q    Okay.  Are you a member of the National Response Team?

18  A    I am.  I am a part time member of the National Response Team

19  East Team.

20  Q    And why was the National Response Team specifically

21  activated for 300 West Indiana?

22  A    Mainly due to the scope of the scene to work.  So the

23  National Response Team was tasked with conducting an origin and

24  cause investigation of the fire.  At the time, when they arrived,

25  it was a collapsed structure that involved necessary heavy

1  equipment and numerous investigators in order to conduct a

2  thorough investigation.

3  Q    Did you know the cause of the fire when the National

4  Response Team was activated?

5  A    No.

6  Q    So is the National Response Team activated for all types of

7  scenes, regardless of the cause?

8  A    That's correct.

9  Q    Did you continue work on this investigation on Sunday, June

10  19th?

11  A    I did.

12  Q    Did you conduct any interviews that day?

13  A    I did.  I interviewed one of the Star Pizza, Fish and

14  Chicken business owners by the name of Neymar Yaya.

15  Q    Why did you interview him?

16  A    So, in conducting fire investigations, one of the early

17  interviews we attempt to do is the business owners, if there's

18  business is involved, and building owners and tenants or

19  eyewitnesses in order to properly assist with the scene

20  investigation and the overall fire investigation.  So they're one

21  of the principal interviews we attempt to do because they have an

22  interest in a fire occurring at the location.

23  Q    Okay.  And did you record that interview?

24  A    I did.

25  Q    Why?

A     Normally, with both building owner and business owners, the

interviews are quite involved because we go over a plethora of

information.  I personally enjoy recording them because I could

have a much more conversational interview with the person I am

speaking to.

Q     If I can direct you to Monday, June 20th, 2022.  Did you

continue your investigation on that day?

A     Yes, I did.

Q     At the beginning of the day before you went out that day to

conduct interviews, which we will speak about in a minute, what

was your knowledge of the investigation at that point as to the

cause of the fire at 300 West Indian Avenue?

A     So after I came back from interviewing Mr. Yaya and his

wife, I came back to ATF offices.  While I was conducting

interviews, other agents of Philadelphia and the National

Response Team were conducting video surveillance canvas of the

area.  When I came back to the office, a video had been recovered

from just down the street from 300 West Indiana.

      That video showed two individuals coming into the area,

making entry into the Bilco doors, which are the basement, open

and closed doors that are in the sidewalk, entering the building,

staying inside the building for approximately 18 minutes, exiting

the building, and walking out of the area.  Approximately three

to four minutes later, the first smoke and fire can be seen on

video.

1    Q    At the time you initially saw the video, and then in the

2    morning of June 20th, did you know who the two people in the

3    video were?

4    A    No, we did not.

5    Q    Okay.  Am I correct that on June 20th, you interviewed two

6    individuals?

7    A    I did, yes.

8    Q    Who was the first person you interviewed?

9    A    So the first -- excuse me -- so the first person I

10   interviewed was Amjad Rahim, who was also a business owner of

11   Star Pizza, Fish and Chicken.  During that interview, I actually

12   requested -- at the culmination of that interview, sorry, I

13   requested that he provide me with contact information for Al-

14   Ashraf Khalil, who was identified as the building owner because

15   we still did not have a proper cellular phone number for him at

16   the time.

17   Q    And were you interviewing Mr. Raheem for the same reasons

18   you stated you were interviewing Mr. Yaya?

19   A    That's correct.  As a business owner of Star Pete's Fish and

20   Chicken, the fire affected the commercial business, so we were

21   getting all the background information and associated information

22   for the scene investigators to conduct their investigation.

23   Q    Did you also record that interview?

24   A    Yes, I did.

25   Q    Now, you stated you asked for his help with contacting the

1  Defendant, Al-Ashraf Khalil, correct?

2  A    Correct.

3  Q    And did he provide assistance?

4  A    Yes, he did.

5  Q    How?

6  A    At the end of his interview, he actually made a phone call

7  to Mr. Khalil.  He actually handed me his cellular phone, and I

8  talked to Mr. Khalil. During that conversation, it would be a

9  standard.  I asked him -- that I had information that he was the

10 business owner or, sorry, the building owner for 300 West

11 Indiana.  He stated that he was.  And at that time, I attempted

12 to, for all intents and purposes, make an appointment with him in

13 order to conduct an interview with him.

14 Q    And did he agree to an interview with you?

15 A    Yes.  He told me that he was currently working at his pizza

16 shop, La Casa Pizza, and stated that we could go to the area in

17 order to interview him shortly after Mr. Raheem's interview

18 concluded.

19 Q    Okay.  And did you agree to do that?

20 A    Yes.

21 Q    Now, you said we.  Was anyone with you?

22 A    So I was also with Senior Special Agent David O'Brien, who

23 was also assigned to the ATF Philadelphia Arson Explosive Task

24 Force.

25 Q    Okay.  Did you proceed to La Casa Pizza to meet with Mr.

1  Khalil?

2  A    Yes, we did.

3  Q    And what did you do when you arrived at La Casa Pizza?

4  A    When we arrived, we parked actually across the street.  La

5  Costa Pizza is actually situated on a fairly busy intersection of

6  the city, so we parked across the street so it wouldn't be so

7  busy.  I then made a phone call to Mr. Khalil on the cellular

8  phone, the number that was provided to me.  He answered.  I told

9  him that we were waiting across the street and he could come out

10 for an interview whenever he was open to come out because he was

11 working at the time.

12 Q    Okay.  So you did not enter his place of business?

13 A    No, we did not.

14 Q    And did he then come to meet you across the street?

15 A    Yes, he did.

16 Q    And can you tell me what happens when he first approaches

17 the vehicle?

18 A    So when Mr. Khalil exited La Casta Pizza, I noticed that the

19 pants and the shoes that he was wearing that day were very

20 similar to the pants and shoes of one of the suspects that we saw

21 in the surveillance video that I stated earlier of the two

22 individuals entering Star Pizza and exiting and shortly

23 thereafter, a fire.  I made note of that.

24     The second thing I requested is at the time when Mr. Khalil

25 was crossing the street, he was actually smoking a cigarette.  I

1  asked him to extinguish the cigarette so it would be a more

2  comfortable environment because we were conducting the interview

3  inside Agent O'Brien's Government vehicle, which was a Ford

4  Expedition, and we didn't really want smoke to cover up the

5  cabin.

6  Q    Why did you speak to Mr. Khalil inside a vehicle?

7  A    Like I stated before, the streets and the intersections that

8  we were on were quite busy.  I knew that the interview was -- he

9  was the building owner, so I had a lot of detailed questions to

10 ask him about the building, so it would be somewhat of an

11 involved interview.  Also, I wanted to record the interview, so I

12 didn't want all the ambient noise of the streets of Philadelphia

13 to affect the recording.

14 Q    Okay.  Did you ask Mr. Khalil's permission before you began

15 recording the interview?

16 A    Yes, I did.

17 Q    And can you tell the Court where everyone was situated

18 inside Special Agent O'Brien's vehicle?

19 A    So when Mr. Khalil walked up, I asked him to put out the

20 cigarette.  He then proceeded to put them out.  I walked around

21 to the driver's side rear seat.  Mr. Khalil entered the passenger

22 side rear seat.  So I was in the back.  Mr. Khalil was in the

23 back.  Agent O'Brien was still in the front driver seat of the

24 vehicle.  The recording device that I used is a handheld recorder

25 that was pretty much placed in the middle of myself, Mr. Khalil,

1  and Agent O'Brien, just so it would be able to pick up all of our

2  voices as we spoke.

3  Q    Okay.  Now, at this point, you've spoken to Mr. Khalil twice

4  on the phone and outside the vehicle; is that correct?

5  A    That's correct.

6  Q    Did you feel that you were able to effectively communicate

7  in English with Mr. Khalil?

8  A    Yes, I did.

9  Q    Did you feel comfortable speaking to him without an

10  interpreter?

11  A    Yes.

12  Q    In the course of your years as an ATF agent, have you

13  previously encountered people where you did not feel they could

14  me actively -- or, excuse me, accurately communicate with you in

15  English?

16  A    Yes.  During the interview phase of investigations, it's

17  readily apparent very quickly that communication is not possible

18  between me and whoever I'm interviewing.  And if that does occur,

19  I request an interpreter come out in order to assist with the

20  interview process.

21  Q    Okay.  And did you feel an interpreter was necessary for

22  this interview?

23  A    No, I did not.

24  Q    Did Mr. Khalil request an interpreter of you before

25  proceeding?

```
1   A    No, he did not.

2   Q    Okay.  Have you listened to that recording since the day it

3   was made?

4   A    Yes, I have.

5   Q    And have you also reviewed a transcript of that recording?

6   A    Yes, I have.

7   Q    And the recording -- the recording itself is accurate as to

8   the best of your memory of that conversation, correct?

9   A    Correct.

10  Q    And the transcript is, for the most part, accurate.  You

11  noticed a couple of typos yesterday that you brought to my

12  attention, correct?

13  A    That's correct.

14  Q    Okay.

15            MS. REINITZ:  Your Honor, at this time, I would ask to

16  move into evidence and play Government Exhibit 3, the recorded

17  interview between Agent Malone, Agent O'Brien and Defendant

18  Khalil.

19            THE COURT:  You may.

20            MS. REINITZ:  Your Honor, with the Court's permission,

21  I'll return to my seat just to be able to stop and start the

22  recording as we proceed.

23            THE COURT:  Yes, you may do that.

24            MS. REINITZ:  Thank you.

25            THE COURT:  But I think we should take five minutes
```

1   because this is lengthy, as I recall --

2           MS. REINITZ:  It is, Your Honor.

3           THE COURT:  -- you telling me.  And I would like to

4   take about five minutes for something I have to do in chambers.

5   Okay.  We'll stand in recess.

6       (Recess from 11:58 a.m. to 12:13 p.m.)

7           THE CLERK:  All rise.  Court is now in session the

8   Honorable Cynthis Rufe now presiding.

9           THE COURT:  Please be seated, everyone.

10          MS. REINITZ:  Thank you, Your Honor.  Your Honor, at

11  this time, I'll begin playing Government Exhibit 3.

12      (Audio recording of Government's Exhibit 3 played in open

13  Court at 12:13 p.m., not transcribed)

14      (Audio paused at 12:14 p.m.)

15  BY MS. REINITZ:

16  Q    Agent Malone, for the record, this portion where he provides

17  his Social Security number has been redacted; is that correct?

18  A    That's correct.

19      (Audio resumed at 12:14 p.m./Audio paused at 12:15 p.m.)

20  BY MS. REINITZ:

21  Q    Agent Malone, can you describe for the Court why you're

22  giving that background to Mr. Khalil?

23  A    So, in the early stages of a fire investigation, when we're

24  talking to either witnesses, people who are renting, business

25  owners, building owners in this situation, I like to give them an

1 idea of what the interview is about, why we're there, kind of

2 what to expect.  So it would -- a lot of times they have gone

3 through a fairly traumatic situation where their business or

4 their building or their homes are gone.  So it just sort of gives

5 them context as to what we're actually trying to do that day

6 during our conversation.

7 Q Okay.  And did you show Mr. Khalil your official bath?

8 A Yes, I did.

9 Q Why?

10 A In order to legitimize why I was there, who I was saying I

11 was, and then I gave him the background of why I was actually

12 There, to talk to him.

13 Q Okay.  At any point, did you provide Mr. Khalil with Miranda

14 rights?

15 A No.

16 Q Why?

17 A Mr. Khalil was not arrested nor was he in custody during

18 this interview.

19 Q Okay.

20   MS. REINITZ:  We're going to continue playing at two

21 minutes into the transcript.

22  (Audio resumed at 12:16 p.m./Audio paused at 12:22 p.m.)

23 BY MS. REINITZ:

24 Q Stopping right there for a moment.  Agent Malone, why are

25 you asking about who pays rent?

1    A    So ATF is a federal agency.  We investigate violations of

2    federal law.  One of those elements that we seek is to establish

3    that the building or the businesses affected interstate commerce.

4    So we ask a lot of questions about leasing, rental payments or if

5    it's a business that is in operation where they get, you know,

6    food deliveries from, things along those lines in order to

7    establish the effect on interstate commerce.

8    Q    And is that common for you in your investigations involving

9    commercial property?

10   A    Correct.

11   Q    Okay.

12           MS. REINITZ:  Resuming at 8:08.

13       (Video resumed at 12:23 p.m./Video paused at 12:24 p.m.)

14           MR. PERUTO:  I just want to note where that comes in on

15   the recording.  For future reference.

16           MS. REINITZ:  I'm sorry, what?

17           MR. PERUTO:  I'm just alerting everybody that that

18   would be one of the things I would like to -- that whole line.

19           MS. REINITZ:  Line 23?

20           MR. PERUTO:  Yeah. Yeah.

21       (Audio resumed at 12:25 p.m./Audio paused at 12:26 p.m.)

22   BY MS. REINITZ:

23   Q    Agent Malone, a couple of days after this recording

24   occurred, do you know if Mr. Khalil, in fact, did attempt to

25   travel outside of the country?

1   A    Yes, he did.

2   Q    I also -- we start to hear another agent speak.  He's

3   reflected in the transcript as Special Agent O'Brien.  Is that

4   accurate?

5   A    That is correct.

6   Q    And throughout this, you are the one who's primarily asking

7   questions, correct?

8   A    That's correct.

9   Q    When people are spelling names for you, who is doing that?

10   A    That is Mr. Khalil.

11   Q    Okay.

12         MS. REINITZ:  Resuming the transcript at 11:16.

13       (Audio resumed at 12:27 p.m./Audio paused at 12:42 p.m.)

14   BY MS. REINITZ:

15   Q    Agent Malone, in this section, you're asking a lot about

16   contractors work for the building and equipment that was put in.

17   Why are you asking those questions?

18   A    So, in the early stages of an investigation for a fire that

19   occurred, especially in this one, because the scene itself was a

20   collapsed building, we're doing our best to locate individuals

21   that might be able to paint a picture as to what the building

22   looked like prior to the collapse to help the scene investigators

23   conducting the origin and cause investigation.

24        So the more people that could tell us how the building

25   looked, you know, what utilities were located, where they were

1  located.  As you see here, I'm asking about the pizza oven so I

2  can get more information for the scene investigators to conduct a

3  more thorough origin and cause investigation.

4  Q    Okay.  And as part of that origin and cause investigation,

5  is someone looking at whether a gas line or pizza oven could have

6  been the cause of the fire?

7  A    That's correct.

8  Q    Okay.

9         MS. REINITZ:  Continuing at 26:27.

10        (Audio resumed at 12:43 p.m./Audio paused at 12:45 p.m.)

11 BY MS. REINITZ:

12 Q    Agent Malone, during all this silence, what's occurring?

13 A    Mr. Khalil is operating his cellular phone in one of the --

14 I don't remember specifically which map application, but he was.

15 You kind of hear the click of the keyboard.  He's attempting to

16 locate a pizza shop where Star Pizza, Fish and Chicken purchased

17 their pizza oven from.  So I'm allowing him to look at his cell

18 phone to try to locate where that pizza shop is for a possible

19 follow up interview.

20 Q    And is it your practice during custodial interviews, to

21 allow someone to have their personal cell phone?

22 A    So if somebody was arrested or in a custodial interview

23 environment, they would not have access to their cellular phone?

24        MS. REINITZ:  Continuing at 28:34.

25        (Audio resumed at 12:46 p.m./Audio paused at 12:55 p.m.)

BY MS. REINITZ:

Q   Agent Malone, during that section, you're asking a lot about keys and locks.  Why are you asking those questions?

A   It's to establish the background of who would have, if the building itself was secured at the time, who would have access to actually physically unlock with a key.  So who has access to the building while it is, in theory, supposed to be secured?

Q   Okay.

MS. REINITZ:  Continuing at 37:34.

(Video resumed at 12:55 p.m./Video paused at 12:57 p.m.)

BY MS. REINITZ:

Q   Agent Malone, whose phone did we just hear ringing on the recording?

A   That was Mr. Khalil's cellular phone.

Q   And howe did you respond when his phone rang?

A   I was going to allow him to answer the phone openly.

Q   And, again, is that something you would do if somebody was in a custodial interrogation?

A   No, they would not be allowed to answer their phone.

MS. REINITZ:  Continuing at 39:01.

(Video resumed at 12:57 p.m./Video pause at 1:03 p.m.)

BY MS. REINITZ:

Q   Agent Malone, in the days following this interview, did the ATF obtain a search warrant for the La Casa DVR?

A   Yes, we did.

1    Q    And did it show you whether or not Mr. Khalil, in fact left

2    with Steve from La Casa Pizza around 1:30 in the morning in his

3    Honda Pilot.

4    A    The video showed that Mr. Khalil did not leave with Steve at

5    1:30 a.m., on the morning of the 18th.

6    Q    Okay.  Did he leave before -- did Mr. Khalil leave before or

7    after 1:30 a.m.?

8    A    Before.

9    Q    And in the course of your investigation, is the time 1:30

10   a.m., significant for any reason?

11   A    Yes.  That is approximately the same time that the two

12   individuals are seen entering the Bilco doors to Star Pizza, Fish

13   and Chicken.

14          MS. REINITZ:  Continuing the transcript at 44:41.

15          (Audio resumed at 1:04 p.m./Audio paused at 1:09 p.m.)

16   BY MS. REINITZ:

17   Q    Agent Malone, why are you asking Mr. Khalil about insurance

18   on the building?

19   A    Part of the follow up investigation where you would do on a

20   fire loss is get paperwork and documentation from the -- if they

21   did have insurance on the building, we would attempt to obtain

22   the underlying insurance paperwork associated with the building

23   or any businesses associated.

24   Q    Okay.  And in the course of your investigation, did you

25   learn whether or not Mr. Khalil, in fact, did authorize an

1  insurance claim to be filed?

2  A    Yes, he did.

3  Q    Okay.

4         MS. REINITZ:  Continuing at 50:31.

5         (Audio resumed at 1:10 p.m./Audio paused at 1:18 p.m.)

6  BY MS. REINITZ:

7  Q    Agent Malone, what were you doing in that portion of the

8  audio we just played?

9  A    So during that time, I was looking at Mr. Khalil's phone,

10 who had it out.  I kind of did lean over, because, like I said

11 before, we were in the same seat and we were looking at his

12 recent calls because I was expecting there to be a number of

13 calls associated with what he was telling me concerning the

14 report of fire, that I was trying to give a timestamp as to when

15 he received those phone calls.

16 Q    And what did you observe as you were attempting to look at

17 his phone?

18 A    So looking at the recent call list associated with a night

19 in which he is telling me that he received numerous phone calls,

20 it was obvious that there was a block of calls that was deleted

21 from the recent call list.

22 Q    And why do you say it was obvious?

23 A    There was a big block in between, and I don't have the

24 approximate time, but for the amount of phone calls that he was

25 telling me he got, there was a significant block in time in which

1  those calls were missing.

2  Q    Okay.

3         MS. REINITZ:  Continuing at 58:14.

4      (Audio resumed at 1:19 p.m./Audio paused at 1:22 p.m.)

5  BY MS. REINITZ:

6  Q    Agent Malone, was Mr. Khalil showing you showing you

7  something in that portion of the recording?

8  A    During that time, Mr. Khalil brought up on his cellular

9  phone his credit score, and he leaned over and he showed me his

10  credit score on his phone.

11  Q    Okay.  And was it just a number, or was there also some

12  written words on what he showed you?

13  A    The number -- this is a misprint in the line 15 should say

14  800.  So there was a number and it was 800.  And everything else

15  on the web page was in English.

16  Q    Okay.

17         MS. REINITZ:  Continuing at 101:54.

18      (Audio resumed at 1:23 p.m./Audio paused at 1:29 p.m.)

19  BY MS. REINITZ:

20  Q    Agent Malone, when you said, that's me, okay, what are you

21  referring to?

22  A    I was calling Mr. Khalil's cellular phone, using my phone

23  and just making sure that I had the correct number for him.

24  Q    Okay.

25         MS. REINITZ:  Resuming at 108:02.

1      (Audio resumed at 1:29 p.m./Audio ended at 1:30 p.m.)

2   BY MS. REINITZ:

3   Q    Agent Malone, after you stopped recording, did you and Mr.

4   Khalil step out of the vehicle?

5   A    I -- excuse me.  I allowed Mr. Khalil to step out first from

6   the passenger side of the car.  He closed the door behind him.  I

7   had a brief conversation with Agent O'Brien, who was sitting in

8   the front seat, stating that could he set up to take a photograph

9   of Mr. Khalil.

10  Q    Okay, I'm going to show you Government Exhibit 4.  Do you

11  recognize this picture?

12  A    Yes, I do.

13  Q    What is it?

14  A    So, when I -- Mr. Khalil got out of the car, I had my brief

15  conversation with Agent O'Brien.  I actually stepped in front of

16  the vehicle.  On the bottom right, you can see the hood of Agent

17  O'Brien's Government vehicle.  That is me on the left and Al-

18  Ashraf Khalil on the right.  I'm attempting to give him a

19  business card to allow him to have my contact information with La

20  Casa Pizza in the background that was referred to a lot during

21  the interview.

22  Q    Okay.  So that's you on the left?

23  A    Correct.

24  Q    Can you describe for the record what you're wearing?

25  A    So I'm wearing khaki pants.  They're cargo khaki pants with

black shoes.  A black polo.  It's actually -- what I'm wearing is
the standard National Response Team uniform that we wear.  It's a
black polo with our ATF issued cargo pants.  Over the breast
heart area is an ATF symbol for the National Response Team.  And
again, I have my credentials or my wallet in my hand.  I'm
actually handing Mr. Khalil a business card.

Q    Are you wearing your duty weapon this day?

A    Yes, I am.  I'm a right-handed shooter, so I am actually
holstered on my right, which is what you can see from the angle
of the photograph, but my polo is actually over my holster, so my
weapon is not visible.

Q    Okay.  At any point during your interview with Mr. Khalil,
do you recall showing or in any way brandishing your firearm with
Mr. Khalil?

A    No, I did not.

Q    Do you recall how Agent O'Brien was dressed this day?

A    Agent O'Brien, funny enough, would be wearing the same exact
thing I am, because he is also a member of the National Response
Team, so we had our standard uniform on, and he also would -- if
I could speak to, he also did not brandish his firearm at any
time during the interview.

Q    Okay.  Now, you stated you wanted a picture of Khalil
because of the clothing that he was wearing.  What about his
clothing drew your attention?

A    Correct.  So, specifically, the pants that Mr. Khalil is

1    wearing, along with the shoes, were very similar to the video I

2    referred to earlier in my testimony concerning the individuals

3    the night of June 18th, 2022, walking towards Star Pizza and

4    entering the Bilco doors.  The clothes he had on were very

5    similar to the clothes of the person in the video.

6    Q    Okay.  And you stated that this shows the approximate

7    location of where you guys interviewed him across from Las Cas

8    Pizza?

9    A    Like I stated before, earlier, we were actually at a parking

10   lot across the street, because you could see in the background it

11   was a very busy street, so we wanted to be a little further away

12   to allow for some ease of interview and for recording purposes.

13          MS. REINITZ:  Your Honor, I would move for the

14   admission of Government Exhibit 4.

15          MR. PERUTO:  No objection.

16          MR. HUFF:  No objection.

17          THE COURT:  It's admitted.

18          MS. REINITZ:  Thank you, Your Honor.

19      (Government's Exhibit 4 admitted in evidence)

20   BY MS. REINITZ:

21   Q    And just a few last questions for you, Agent Malone.  At any

22   point during your interaction with Mr. Khalil, was he handcuffed

23   or prevented from leaving the vehicle or your presence in any

24   way?

25   A    No, he was not.

Q    At any point -- we just listened, of course, to the entire recording.  But at any point before or after the recording, do you recall or do you recall hearing Agent O'Brien threaten Mr. Khalil in any way?

A    No, he did not.

Q    Did you tell Mr. Khalil he had to speak to you?

A    No.  No, I never stated that he had to speak to me.

Q    And did you feel you could understand him during the course of your interview?

A    Very well.  Yes.

Q    Agent Malone, did ATF, in fact, request that Khalil appear for a follow-up interview the next day at the ATF offices?

A    That's correct.  The next day, we requested that Mr. Khalil, along with Mr. Yaya and Mr. Raheem (phonetic), come down to ATF offices, located 200 Chestnut street, for follow-up interviews.

Q    And did he voluntarily appear?

A    Yes, he did.

Q    When Khalil was at ATF, did members of the ATF ask if they could search Mr. Khalil's phone?

A    Yes, we attempted to gain consent to search Mr. Khalil's cellular phone, at which time he stated he would not give us consent to search the phone.

Q    Okay.  Do he did not provide consent, and you did not search the phone that day?

A    Correct.

1   Q    Now, without getting into the content of what was discussed

2   after his eventual arrest, did you participate in multiple

3   proffer meetings with Khalil, his attorney, and attorneys from

4   the Government?

5   A    Yes, I did.

6   Q    Can you please tell the Court whether or not an Arabic

7   interpreter was necessary during any of those proffer meetings?

8   A    So we sat in multiple proffer meetings with Mr. Khalil.  The

9   first meeting, we had an interpreter present during the initial

10   proffer, but during that meeting, it was deemed that an

11   interpreter was not necessary.  And subsequent multiple meetings

12   after that, we did not have an Arabic interpreter present.

13   Q    Okay.  And again, without getting into the content, did you

14   feel in those proffer meetings that you could understand Mr.

15   Khalil and that he could understand questions being posed to him?

16   A    Yes, I did.

17         MS. REINITZ:  I have nothing further, Your Honor.

18         THE COURT:  All right.  Thank you.  It is not

19   appropriate to rush right into cross-examination.  We do need a

20   break.  People do need sustenance even a little bit.  So give me

21   a best estimate, Ms. Reinitz, of how much longer your direct and

22   argument will take.

23         MS. REINITZ:  So I'm done with my direct examination.

24   We have no further witnesses.  So it will just be argument and

25   questions of the Court on these motions and the remaining

1    motions.

2              THE COURT:  Okay.  Mr. Peruto?

3              MR. PERUTO:  I have no cross-examination for the

4    witness, and it will be the same.

5              MR. HUFF:  Same, Your Honor.

6              THE COURT:  Okay.  I would love to barrel through, but

7    we need a half hour, okay.  Thirty minutes we come back.  What

8    time is it right now?  I don't have a clock on this --

9              MS. REINITZ:  It's 1:35, Your Honor.

10             THE COURT:  Okay.  So we'll come back at 2:05.

11             MS. REINITZ:  Okay.

12             THE COURT:  We're in recess.

13        (Recess from 1:36 p.m. to 2:13 p.m.)

14             THE CLERK:  All rise.  Court's now in session.  The

15   Honorable Cynthia M. Rufe now presiding.

16             THE COURT:  Please be seated everyone.

17             All right.  Would you like to make argument?

18             MS. REINITZ:  Yes, Your Honor.

19                      GOVERNMENT'S ARGUMENT

20             MS. REINITZ:  Your Honor, as to the motion to dismiss,

21   Your Honor has heard evidence from the ME that the reason why

22   Lieutenant Williamson was killed was not because he didn't have

23   any sort of additional oxygen with him.  It was simply because he

24   was crushed by the building.  Agent Malone told you that there

25   was no record with LNI prior to the fire of any sort of known

1 problem with the building.

2       The Defendant, Your Honor, essentially is attempting to

3 turn the criminal conduct that him and Mr. Jaghama committed by

4 setting fire in an occupied building into a civil dispute

5 regarding who should have done what and assumption of risk by

6 first responders.  There is, Your Honor, some report of

7 firefighters mentioning at the scene.  It looks like a wall is

8 bulging, we got to figure out what that is.  There was not a get

9 out of the building.  It's collapsing.  You can hear it creaking.

10 There was none of that, Your Honor.  The firefighters, as you

11 heard, were in there putting out the remains of the fire, making

12 sure the fire was out.  And an LNI Inspector was there at the

13 time of the building collapse to see if the building was fit.

14       The Defense, Your Honor, is essentially trying to erase

15 from the statute the language of any public safety officer

16 performing duties as a direct or proximate result of the conduct.

17 I don't think there's a dispute, Your Honor, that the

18 firefighters and the fire marshals and the license and inspection

19 people were there because of the fire, and they were there doing

20 their job, trying to determine if the building was safe, trying

21 to determine if the fire was out.

22       Essentially, the Defense is asking this Court to excuse

23 the fact that people were seriously injured and somebody was

24 killed because it happened because of a building collapse and not

25 smoke inhalation, and that is simply not, Your Honor, by the

plain reading of the statute, the intent of Congress.  Congress

clearly says it includes any public safety officer performing the

duties as a result of the conduct, and that is exactly what was

happening at the time.  The conduct, Your Honor, is setting the

fire, which leads to everything that happened.

We state, Your Honor, that this case is most analogous

to the Fifth Circuit case United States v. Severin, where the

Fifth Circuit specifically found that the Government did not have

to prove foreseeability.  In that case, the Defendant argued that

the Government had the burden of showing that it was foreseeable

that a firefighter wearing his normal breathing equipment in the

course of fighting the fire would somehow be injured by wearing

that equipment.

The Fifth Circuit rejected that, finding that there was

evidence in the record that a firefighter was injured as a result

of firefighting activities, the exact thing that's happening

here, and that was sufficient to show that his injuries were a

direct and approximate cause of the firefighter firefighting.

This is exactly what happened here, Your Honor.

And at trial, the Government does agree that, of

course, there needs to be interrogatories where this is found,

the direct and proximate cause for the injuries and for the

death.  But, Your Honor, the Defense is essentially trying to

argue sentencing issues before the jury.  They're trying to put

forth jury nullification.  He didn't mean for somebody to die

1    when they lit a fire in an occupied building filled with two

2    families in the middle of the night, when somebody is normally at

3    home sleeping.

4           They're trying to get out on essentially the reason

5    somebody died, the reason somebody was injured, and it's just not

6    the intent of the statute, Your Honor, to put in an extra burden

7    when the conduct is without a doubt the reason why firefighters

8    and LNI are at that building.

9           So, Your Honor, I would ask that you instruct the jury

10   accordingly as to the direct and proximate cause.

11          THE COURT:  Let me just ask you a few questions about

12   that, because all of the precedent is somewhat conflicting.  Some

13   of the cases that were cited by counsel, and I do appreciate the

14   briefing, really weren't on exactly the dot.

15          So I have to go back to causation because that's where

16   this goes.  The motions to dismiss Counts 1 and 2.  Tell me

17   exactly what the Government's theory is about which causation

18   standard applies in 844(i) and is it in this case only or in all

19   cases?

20          MS. REINITZ:  Well, Your Honor, obviously, direct

21   approximate cause is what's put forth in statute as Your Honor

22   said, it's for.  The Government submits that the definition, if

23   you will, of proximate cause as set forth by the Third Circuit is

24   in the United States v. Crandon case, in which the Third Circuit

25   found that the proximate cause was equivalent to, quote, "a

1   substantial factor, rather than defining proximate cause to

2   incorporate foreseeability, Your Honor. So that would be the

3   Government's position in this case.

4          THE COURT: You cited the Fifth Circuit, right?

5          MS. REINITZ: There was also, yes, Your Honor, a case

6   out of the Fifth Circuit, <u>United States v. Severin</u>, who dealt

7   with an injury to a firefighter and proximate cause.

8          THE COURT: But it didn't really define that term in

9   that case?

10          MS. REINITZ: It did not, but it did say that

11   foreseeability was not an issue. It specifically said that

12   simply the record was clear that the firefighter was injured

13   because of the firefighting activities and that there was

14   sufficient evidence in the record to show that his injuries were

15   the direct and proximate cause of the firefighting. They

16   rejected the Defendant's argument that the Government had to

17   prove that such injuries would be foreseeable to the Defendant

18   lighting the fire.

19          THE COURT: Congress has used the word proximate or

20   similar language in other criminal statutes; haven't they?

21          MS. REINITZ: Yes.

22          THE COURT: And those are statutes that involve death

23   results or injury results and enhancements, therefore?

24          MS. REINITZ: Yes, Your Honor.

25          THE COURT: Haven't other Courts interpreted these

statutes as applying proximate to the death or injury?

MS. REINITZ:  Yes, Your Honor.

THE COURT:  How is this any different?

MS. REINITZ:  Because Congress makes it different.
They say if personal injury results to the person, including any
public safety officer performing duties as a direct or proximate
result of conduct.  I submit, Your Honor, that Congress is saying
if they are performing their duties as a direct or proximate
result of a fire and are injured or killed, that's all we're
looking for.

THE COURT:  Well, just say, for example, if I do
disagree with the Government's interpretation of the text, and I
find that direct or proximate modifies death or personal injury,
do you then lose on the foreseeability question?

MS. REINITZ:  No, Your Honor.  I don't think it's
unforeseeable that a building could potentially become unstable
because of a fire.  Unfortunately, building collapses, whether
it's pieces of the building, debris falling, or a building
itself.  I don't believe that's unforeseeable, Your Honor.

I would also note that the Defense referenced a
Government engineering report where the engineer examined the
cause of the building collapse and found that, essentially, the
water that was being put in the building, the overhaul that you
heard about, the removing of sheet rock and things like that, is
essentially what broke the camel's back, right.  You had an old

1　building, and when you shift what's known as the live load,

2　right, the weight of the building to that degree, that's what

3　caused it to collapse.  And I don't think that's something that's

4　unforeseeable for firefighters or people in general.  I don't

5　think that's so remote or unforeseeable that that would change

6　it, Your Honor.

7　　　　　In fact, one of the cases cited by the Defense

8　concerned a firefighter who had a heart attack in the course of

9　fighting a fire.  And even in that case, the Court found that

10　that's foreseeable, right.  That it's a strenuous activity.  It's

11　in there.

12　　　　　I don't think that anyone can, with a straight face

13　argue that building damage or something that would make a

14　building no longer structurally sound, couldn't result from a

15　fire.  Fire destroys what it goes through.  The fact that they

16　were able to put it out and then it collapsed is just simply the

17　events in this case.  It could have very well have collapsed just

18　through the fire, Your Honor.

19　　　　　So even if Your Honor decides foreseeability and

20　foreseeability specifically that a building would be damaged, I

21　don't think we lose.  That's the whole point of setting the

22　arson.  They're trying to damage the building.  They're trying to

23　get the insurance money.  Certainly, any damage that results is

24　foreseeable.  That's the whole point of doing this.  There's no

25　insurance claim.

1          THE COURT:  So I think that's what you mean by

2     proximate?

3          MS. REINITZ:  It is, Your Honor.

4          THE COURT:  But it's the same thing, in your case, as

5     direct.  Setting a fire caused everything else to happen.

6          MS. REINITZ:  Yes, Your Honor.

7          THE COURT:  And that begs the question about why

8     Congress included or proximate with it.  And some courts, and I

9     think even the Third, is playing on the safe side.  And I think

10    trial courts do this more often than appellate courts.  They play

11    on the safe side, and they allow the jury to hear everything.

12    And then the Court decides what appropriate instructions should

13    be given, depending on what the Government had proffered in the

14    way of facts.  And this may be one of those cases.  But it begs

15    -- again begs the question, what does proximate mean.

16         MS. REINITZ:  And, Your Honor, again --

17         THE COURT:  Foreseeable or not?

18         MS. REINITZ:  I think it's a -- I would again state

19    that I think it's the Third Circuit's own words, where it defined

20    proximate cause as equivalent to a substantial factor in what

21    happened instead of foreseeability, and that's in the Crandon

22    case.

23         THE COURT:  Well, I think I have to go to the U.S.A

24    Supreme Court first, and I think in Burrage, causation is

25    typically a hybrid concept.  It's both actual cause and proximate

1    cause, and that comes from the common law.  But that's also

2    included in criminal statutes, is it not?

3          MS. REINITZ:  Oftentimes, yes.  And you're right the --

4          THE COURT:  Because if it isn't, we have nothing but a

5    strict liability statute here, which I don't think is

6    appropriate.

7          MS. REINITZ:  I agree, Your Honor.  Congress said,

8    director or proximate cause.

9          THE COURT:  Okay.  And then, of course, there's that

10   Paroline case with approximate textual clue in the context of

11   victim restitution, not exactly death.  The Supreme Court said

12   that that was enough to apply to the whole subsection, and it

13   includes foreseeability.  So why is this case different?

14         MS. REINITZ:  Well, Your Honor, that's dealing with

15   something very different as Your Honor said.  That's dealing with

16   restitution, right, and what a Defendant has to pay for injuries

17   to a victim, right.  That's a completely different thing than a

18   statute that's assigning conduct, right.  Restitution is what was

19   foreseeable to this Defendant in what they did as far as costs,

20   right.

21         And even there, I think, in the case law that's

22   followed, it's become very broad, right.  It's foreseeable

23   somebody may need mental health and treatment.  It's foreseeable

24   somebody may have lost wages, right.  That foreseeability, in

25   turn, has become very broad.  But that's dealing with

1    restitution.  That's very different than the language that we

2    have here about the officers and performing their duties and

3    making it a direct or proximate result.  So I think the two

4    statutes, Your Honor, are different.

5            THE COURT:  Because this one deals with the public

6    safety officer?

7            MS. REINITZ:  Correct.

8            THE COURT:  Well, I'll examine that again.  Before we

9    go on to other matters --

10            MS. REINITZ:  Yes, Your Honor.

11            THE COURT:  -- was there any rebuttal argument, Mr.

12    Peruto?

13            MR. PERUTO:  No, Judge.

14            THE COURT:  Mr. Huff?

15            MR. HUFF:  Judge, I briefed this matter.  I've cited

16    the Pritchard case, as the Prosecutor had pointed out.  And the

17    point, I believe, in that case was that the firefighter had prior

18    heart attacks, died eight days after the incident, had coronary

19    disease, blocked arteries, had not been taking his medication.

20    So those arguments were permitted by the Court to be made to the

21    jury, and the jury made a decision.

22            THE COURT:  Its decision that said he was liable

23    anyway.

24            MR. HUFF:  Right.  What the Government seems to be

25    doing here is wanting to gag and I guess maybe even redact parts

1    of the engineering report out of the documents so that the jury

2    would only be able to draw one conclusion, and that is that this

3    fire was strict liability, caused the death, and that there

4    should be no argument at all.  Obviously, Your Honor, that should

5    be a matter left up to the jury.  I believe Congress put in

6    direct or proximate cause.  They didn't have to.  They could have

7    just wrote, including any public safety officer performing their

8    duties, period.  They could have just ended it right there, but

9    they didn't.  They chose to put in that language of direct or

10   proximate cause.

11         In the superseding indictment that the Government has

12   filed, they added that language from the initial indictment.  And

13   in the superseding indictment, Judge, they don't say direct or

14   proximate cause.  They say direct and proximate cause.  So

15   they're sort of hedging their bets that they want to be able to

16   argue both.  We agree.  We want to be able to argue

17   foreseeability, and that should be a matter that's left up to the

18   jury.

19         It's a 5 to 20 year mandatory minimum when there's no

20   injuries.  It's a 7 to 40 year -- well, 7 would be the mandatory

21   minimum.  The maximum would increase from 20 to 40 years.  And if

22   a person dies as a direct or proximate result, then, of course,

23   it goes up to, you know, whatever the Court decides.  It could

24   even be the death penalty, which I believe this case, at a

25   certain point in time, was considered for that but is not any

1    longer.

2           THE COURT:  I don't believe the Government is seeking

3    the death penalty here either.

4           MR. HUFF:  No.

5           MS. REINITZ:  Correct, Your Honor.  We have been

6    instructed by the Attorney General not to seek the death penalty.

7           MR. HUFF:  So, again, Your Honor, you have an increase

8    of penalties, depending on what the jury finds.

9           THE COURT:  Which always makes it a jury issue --

10          MR. HUFF:  Exactly.

11          THE COURT:  -- is mandatory increase in mandatory

12   minimums.

13          MR. HUFF:  That's correct, Judge.  So there will be an

14   -- you know, and we have to provide them with direction as to

15   what direct or proximate result means.  And they are specific

16   legal terms of art.  We're all familiar with them.  They do have

17   a specific meaning, and that normal meaning includes a

18   foreseeability aspect of it.  If the jury says, yes, it was

19   foreseeable, that's fine, but obviously we should be in a

20   position where we can argue to the contrary.

21          THE COURT:  I appreciate your argument.

22          MR. HUFF:  Thank you, Your Honor.

23          THE COURT:  Thank you.  All right.  I'll take that

24   decision under advisement.

25          This goes hand in hand, however, with the Government's

1   motion in limine to exclude improper defenses.  Ms. Reinitz.

2         MS. REINITZ:  Mr. Miller will address you on that, Your

3   Honor.

4         THE COURT:  Mr. Miller, excuse me.

5         MR. MILLER:  Yes, Your Honor.  Obviously, we've covered

6   some of the ground on this already.  It still remains our

7   position that the plain language of the statute means that direct

8   or proximate result modifies duties and not death or injury.  And

9   I would just say the way that the Defense reads this, under the

10   Defense's reading 844, I would read if personal injury results to

11   any person as a direct or proximate result of conduct prohibited

12   under this subsection.  But Congress didn't just say that.  They

13   specifically added, including any public safety officer

14   performing duties.

15         So the issue for the jury is whether the victims were

16   at the scene because the Defendants set a fire.  It's not whether

17   it was foreseeable that setting the fire would injure the

18   victims. Now, we believe that even if the Court finds that it's

19   the second one, we would still prevail.

20         But the reason we're bringing this to the Court's

21   attention now, I think, was illustrated today.  We had

22   questioning about the obesity of a dead firefighter.  We had

23   questioning about the tactics of whether the firefighters were

24   negligent.  The firefighter's family is going to be -- six

25   firefighters' families are going to be in the courtroom.  Five of

1    the living ones are going to be testifying in this case.

2           Congress did not intend for the firefighter's

3    negligence to be brought into question, right.  If we go down the

4    foreseeability route, it opens up a Pandora's box of issues.  Is

5    the firefighter obese?  Things that are completely inappropriate

6    and are not fitting with the language of the statute.  What the

7    statute says is that if a public safety officer was performing

8    duties as a direct result or as approximate result of the arson,

9    then the mandatory minimum applies.

10          So the question for the jury is whether they're in that

11   building as a direct or proximate result of the arson.  That is

12   the only question that the jury should consider, and that would

13   close the door on these completely inappropriate arguments on

14   issues like obesity, which should not be brought before the jury,

15   but would have to be brought before if the Defendant's

16   interpretation prevails, because you could say, well, anything

17   goes to foreseeability.  Let's just open the door up and throw it

18   all out there to the jury.

19          And the Government understands what the Court is saying

20   about playing it safe, but in this case, playing it safe creates

21   a trial within a trial.  It creates a mini trial, and it creates

22   a distraction that is not fitting with the plain language of the

23   statute.

24          THE COURT:  Well, maybe so, but there are injuries or

25   medical conditions that more easily contribute to a traumatic

1    death than others.  This isn't about a hangnail.  This is about

2    someone's ability to breathe.  And I also have to remind you, we

3    have to go back to the facts.  I don't know what he was wearing.

4    Was he wearing the hard type shield?  Did that collapse on him,

5    too?  Was it crushed stone, bricks, whatever.  I think it goes to

6    the facts, and I can't presume right now that I know all of those

7    facts.

8           MR. MILLER:  So to be clear, we're not asking the Court

9    to presume any facts.  We are saying that the Court should rule

10   that foreseeability is not an element of the statute, and so

11   evidence regarding foreseeability should not come in before the

12   jury.  If the Court disagrees with that, then what we will argue

13   at trial is that the Defense would have to show, under a

14   substantial factor standard, what caused -- or we would have to

15   show, under a substantial factor standard, what caused the death

16   of the injury.

17          It would be clear at trial, for instance, that --

18          THE COURT:  You could win this either way?

19          MR. MILLER:  Yes, we could win it either way.

20          THE COURT:  You don't really have to argue no proximate

21   cause, no foreseeability.  You could easily, with what evidence I

22   saw today, convince a jury that --

23          MR. MILLER:  You could, Your Honor.

24          THE COURT:  -- he was going to die because he was in

25   there, and that building was unstable from the fire.

1    MR. MILLER:  We do believe that we would win it either

2    way, Your Honor, but we also believe that the plain language of

3    the statute shows that direct or proximate cause modifies duties

4    and it does not modify, as the Court -- the Court put its finger

5    earlier on the exact question, does it modify duties or does it

6    modify death or injury?  And we believe, and if you look at the

7    Fifth Circuit, when it interpreted the statute, that it modifies

8    duties.  That's how, if you were going to read the statute in

9    this plain language, that's what it modifies.  And we believe

10   that's why our motion is appropriate and why the Court should not

11   permit evidence along the lines of, this wasn't foreseeable,

12   because foreseeability simply is not a requirement under the

13   plain language of the statute.

14         THE COURT:  Then say --

15         MR. STEIN:  Judge, may I just --

16         THE COURT:  Well, yes, but --

17         MR. STEIN:  -- if you're finished.

18         THE COURT:  I'm not sure he is.

19         MR. STEIN:  Okay.

20         THE COURT:  And I was going to ask him another

21   question.  I'll get to you, okay.

22         What would you submit to the jury then, if I don't

23   dismiss -- and this is to both of you -- Counts 1 and 2 are not

24   dismissed, what are your proposals for how the Government meets

25   its burden in arguing for the sentence enhancements, which have

1    to be done beyond a reasonable doubt?

2           MR. MILLER:  Are you saying Counts 1 and 2 are not

3    dismissed, but you are also denying the Government's motion in

4    limine?

5           THE COURT:  I am curious if I do deny it --

6           MR. MILLER:  Yes.

7           THE COURT:  -- what your burden -- what you think your

8    burden is?

9           MR. MILLER:  Our burden would be to show that the arson

10   was a substantial factor in the death and the injuries suffered

11   by the firefighters, and we would have to prove that beyond a

12   reasonable doubt.  We're getting the substantial language or

13   substantial factor language from the Crandon case that Ms.

14   Reinitz discussed earlier, which is 173 F3d. 122.

15          In the context of that case, the Third Circuit was

16   discussing what proximate causation means in the context of a

17   criminal case.  And the Third Circuit said you can define

18   something as a proximate cause if it was a substantial factor in

19   bringing about a harm.  So a death or an injury.

20          THE COURT:  So that's more clear than what the Fifth

21   Circuit did, because they didn't hold that direct or proximate

22   was required.  No case has done that, really.

23          MR. MILLER:  No.  The reason we cited the Fifth

24   Circuit, Your Honor, was because the Defendant on appeal argued

25   that a foreseeability requirement had to be met, and the Fifth

1    Circuit rejected that.  And then the Fifth Circuit upheld the

2    interrogatory.  And the interrogatory is, quote,

3            THE COURT:  Seemed to include it.

4            MR. MILLER:  Yes.

5            THE COURT:  But it wasn't exactly a holding of the

6    Court.

7            MR. MILLER:  No.  And I think that that's the case in

8    the Sixth Circuit case that Pritchard discusses.  Everyone just

9    sort of assumed that the proximate -- direct and proximate cause

10   modified injury or death.  But if you look at the plain language

11   of the statute, that's not how it reads.  And what -- I mean,

12   I've said it before, but it would be akin to eliminating the

13   language of public safety officer from the statute entirely.

14   There's no reason to put it in there at all if you're going to

15   make foreseeability a requirement.

16           THE COURT:  Well, we're going to see what the Defense

17   has to say about your position and your argument there.  But I

18   need to hear from the Government.  If this does go to a jury

19   question on the enhancements, as it does in other types of cases,

20   other types of crimes that are on trial, how would you do it?

21   Via special interrogatories?

22           MR. MILLER:  Yes.

23           THE COURT:  A severance in the proof?  How would you do

24   it?

25           MR. MILLER:  We would submit an interrogatory, Your

1    Honor, just as the Fifth Circuit approved of in its case.  So I

2    think we would submit an interrogatory along the language of what

3    the Fifth Circuit said, beyond the -- we would have -- the jury

4    would have to find beyond a reasonable doubt that the fire

5    resulted in personal injury and/or death to any person, including

6    a public safety officer, as a direct approximate result of the

7    fire.  And then in instructing on what proximate result means, we

8    would ask the Court to follow Crandon and say that it means that

9    the arson was a substantial factor in causing the death or the

10   injury.

11          THE COURT:  Would these special interrogatories be

12   included at the Government's request within the verdict form --

13   the initial verdict form, or would it be a separate submission

14   after they have rendered a verdict?

15          MR. MILLER:  I believe it would be appropriate to

16   include it in the initial verdict form, Your Honor.

17          THE COURT:  All right.  I think we all have to have a

18   visual of how this happens --

19          MR. MILLER:  Yes.

20          THE COURT:  -- because those of us who have been in the

21   trial courts for so many years know that separating proof, as we

22   sometimes want to do in felon in possession cases, is never a

23   good one for the jury.  And in this one, they would want not to

24   have to, after rendering a serious verdict, have to come back and

25   deal with a death.

1          MS. REINITZ:  Your Honor, if I may.  I think it's akin

2     to a 924(c) case where the jury first has to find if a gun was

3     present.

4          THE COURT:  Exactly.  Exactly.

5          MS. REINITZ:  And then was it Brandish, was it used?  I

6     think -- and we put forth in our response to the motion that the

7     interrogatories to the verdict -- I'm sorry, to the jury on the

8     verdict sheet are required, and we do think that it should be in

9     one initial verdict sheet.

10         THE COURT:  Okay.  Thank you.

11         So I'm going to turn to the defense for Mr. Khalil.

12    Mr. Stein.

13                   DEFENDANT KHALIL'S ARGUMENT

14         MR. STEIN: If the Court please.  Listening carefully to

15    the arguments here, what you have going on here in the facts as

16    indicated by the engineering report produced by the Government,

17    should be allowed to be explored in a trial, because what you

18    have here, it seems to me, is firefighters who consciously

19    disregarded a known risk, and that is something that is not

20    foreseeable and is an intervening factor in determining whether

21    there's direct result or proximate cause.

22         And I think that has to go to a jury for them to make

23    that determination, especially in light of one of the

24    firefighters is warning the firemen to get out of the building as

25    fast as possible when they are all looking at a building that

1  looks like it's in danger of collapse.

2         So I don't understand, quite frankly, what the problem

3  is here with what you have in an engineering report produced by

4  the Government's own expert.

5         THE COURT:  The warning is one thing, from the fireman.

6  How fast this occurred is another thing.  I don't know the answer

7  to that.  So if that's disputed, it needs to be addressed.

8         MR. STEIN:  Yes.

9         THE COURT:  And does the Defense have an expert they're

10  going to present on this?  I'm not trying to pin you down, but if

11  you go to trial, is there an expert that's going to say, it

12  didn't matter, it was coming down anyway?

13         MR. STEIN:  Well, obviously, we will explore the issue

14  of whether there is an expert who can opine on what to do in the

15  circumstances you have here, but you also have the direct

16  evidence of a firefighter, a lieutenant, who's on the scene and

17  who is warning about the collapse of a building, which is clearly

18  being disregarded.

19         THE COURT:  And Disregard is what time again?  I mean,

20  you have to go back to the actual event and know how quickly

21  anything happened.  And I think that it's very telling that we

22  can't do that yet.

23         MR. STEIN:  No, I agree with that, Your Honor.

24         THE DEFENDANT:  Can I say something?

25         MR. STEIN:  No.

1          THE COURT:  How would you think, if I allow this, that

2   the issues should be submitted to the jury, Mr. Peruto?

3          MR. PERUTO:  Well, if you're speaking of the evidence.

4          THE COURT:  No, I mean in the verdict form, special

5   interrogatories, et cetera.

6          MR. PERUTO:  With regard to the interrogatories, Judge,

7   I think they should be part of the verdict sheet.

8          THE COURT:  You agree?

9          MR. PERUTO:  I think that's the clearest way --

10  cleanest way to do it, and it lightens up the jury's duties.

11         THE COURT:  It may, as long as the evidence isn't

12  muddled.

13         MR. PERUTO:  Yes.

14         THE COURT:  But you agree with the Government, then it

15  comes in all at once?

16         MR. PERUTO:  On one verdict sheet, interrogatories

17  would have to be answered.

18         THE COURT:  Okay.  Mr. Huff, would you like to say

19  anything about this?

20         MR. HUFF:  Judge, I agree with that as well.

21  Obviously, when we're dealing with felon in possession of a

22  firearm case, we don't want the jury to hear that the Defendant

23  had a prior conviction.  That's why we sanitize it so they're not

24  influenced by that fact.  But this is not -- this isn't that type

25  of case.  You know, they can hear all the evidence at once, and

1    they'll make the determination at the same time without having to

2    start and stop again.

3              THE COURT:  Good.  I've had to work very hard to get

4    someplace where everybody's in agreement, but this job is not for

5    sissies, is it?

6              Okay.  I think we'll cut off the arguments now on the

7    motions to dismiss Counts 1 and 2, and the motion in limine to

8    exclude improper defenses.

9              Let's deal with the motion to suppress statements

10   during the ATF interview, specifically the ATF interview in the

11   car outside of La Casa Pizza.

12             MR. PERUTO:  Judge, if I go first, it might cut it

13   short.

14             THE COURT:  Go ahead.

15             MR. PERUTO:  I have no argument.

16             THE COURT:  So you want to withdraw this suppression

17   motion?

18             MR. PERUTO:  I know that, you know, 255, they don't

19   like you to withdraw motions, but this is a motion without merit

20   after hearing all the evidence and the last line of the Defendant

21   when he said, anytime you guys want to talk to me, I'm right

22   here.

23             THE COURT:  It certainly doesn't indicate coercion or

24   threats or intimidation.

25             MR. PERUTO:  Yeah, I'm going to withdraw

1    [indiscernible].

2          THE COURT:  I need to hear from your client if you wish

3    to withdraw it.

4        (Counsel and Defendant confer)

5          DEFENDANT KHALIL:  Yes, Your Honor.

6          THE COURT:  All right.  Did you discuss with your

7    attorneys, both of them, withdrawing the motion to suppress your

8    statements?

9          DEFENDANT KHALIL:  I didn't, but I just did right now,

10   so I agree.

11         THE COURT:  Well, we're here right now, so this is the

12   time to talk.

13         DEFENDANT KHALIL:  Yes, I agree, Your Honor.

14         THE COURT:  Okay.  Do you understand that if you

15   withdraw this after talking to your attorneys, then the Court

16   will not have to rule on it, even though I'm pretty clear how I

17   was going to rule anyway?  I will just tell you, if you withdraw

18   it, then you can't argue during the trial that you don't think it

19   was right that that evidence came in.  Nobody can object to that

20   evidence coming in.  That is that transcript that we all listened

21   to and read, right?  Do you understand that?

22         DEFENDANT KHALIL:  Yes, I understand, Your Honor.

23         THE COURT:  And that could be very compelling evidence

24   if they prove you lied in that statement.  Do you understand

25   that?

1          DEFENDANT KHALIL:  Yes, I understand, Your Honor.

2          THE COURT:  Okay.  But the grounds for the suppression,

3    you understand, are not there?

4          DEFENDANT KHALIL:  Yes, I do.

5          THE COURT:  They don't exist.  Is that what you mean?

6          DEFENDANT KHALIL:  Yes.

7          THE COURT:  I don't want to put words in your mouth.

8    Are you willing to withdraw the motion?

9          DEFENDANT KHALIL:  Yes, Your Honor.

10         THE COURT:  Thank you.

11         DEFENDANT KHALIL:  You're welcome.

12         THE COURT:  Well, I won't have to go through findings

13   of fact and conclusions of law, but I certainly could not find

14   any Government coercion, enticement, subterfuge, and anything but

15   open ended questions.  I found that the voluntariness of Mr.

16   Khalil's participation in that particular -- is it June 20th?

17         MS. REINITZ:  June 20th, Your Honor.

18         THE COURT:  2021.

19         MS. REINITZ:  2022.

20         THE COURT:  '22, excuse me, was quite voluntary and

21   that there would not be a basis for me to suppress any of the

22   statement or any parts of the statement.

23         So we dismiss the motion as withdrawn.  That didn't

24   involve Mr. Jaghama, so that has nothing to do with him.

25         In this transcript, however, I don't want to miss this

1  or forget about it, Mr. Peruto pointed out two instances where

2  Palestine and references to being Palestinian or traveling there

3  were mentioned voluntarily by Mr. Khalil, and the statement's

4  coming in now, so he wants that redacted.  Will the Government

5  work with the Defense on redactions of any potential prejudicial

6  remarks that are irrelevant and immaterial?

7          MS. REINITZ:  Of course, Your Honor.  We will work with

8  them to figure out a way to either redact it or reference simply

9  the country or something like that.  We will find a way to remove

10  anything that would indicate it's Palestine.

11          THE COURT:  I'll leave it to good counsel to figure

12  that out.  Sometimes efforts make it worse, saying something

13  like, well, he goes there every year, but it doesn't say why.

14  And he's looking at -- and the jury is looking at all of the

15  persons who are testifying.  So it may not be something you can

16  hide, but the actual inflammatory nature of just the noun at this

17  time in the World's crisis is what I'm talking about.  Maybe

18  another time it wouldn't matter at all, but right now, let's be

19  sensitive to it.

20          MS. REINITZ:  Understood, Your Honor.  Of course.

21          THE COURT:  Okay.  I'll leave that to you, and we'll

22  take it up with counsel at another time if you need the Court's

23  assistance.

24          So then, Mr. Jaghama's motion to exclude evidence of

25  arsonist reputation.  Mr. Huff?

1          MR. HUFF:  May I, Your Honor?

2          THE COURT:  Yes.

3          MR. HUFF:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MR. HUFF:  Judge, just to sort of paint a little

6   picture for the Court, I think my writings have done that

7   already, but there were numerous statements given to law

8   enforcement throughout the investigation of this case, including

9   statements from, as you've heard, Mr. Khalil, as well as Amjad

10  Raheem, who was one of the owners of Star Pizza, as well as

11  Neymar Yaya, who, again, was one of the co-owners of Star Pizza

12  itself.

13         Mr. Khalil, you heard the first statement that he gave,

14  basically it does not implicate himself whatsoever in being

15  involved in the arson.  As time goes on, however, that changes,

16  and he does begin to take responsibility for being a part of or

17  setting the fire.  Judge, he also indicates that my client was

18  involved in setting the fire, that he had done so in the past.

19         And he, in fact, mentions that he was a part of setting

20  a fire at other pizza places, including -- and also a furniture

21  store located on Frankfurt Avenue, and also he talks about using

22  an extension cord connected to a washing machine in order to set

23  a fire.  He also tells police that my client has a reputation in

24  the Palestinian community as being an arsonist.

25         So, obviously -- and this goes along with my motion to

sever, Your Honor. Obviously, if that information is going to be
presented to the jury, I have no way of knowing whether or not
Mr. Khalil is going to testify. He could sit here today and say
that he's not going to testify, but, you know, that could change.
It happens all the time. And if he chooses not to testify,
however, I will be unable to cross-examine him on that
information that he has, Your Honor, and, therefore, be
prohibited from our Sixth Amendment right to confront and cross-
examine witnesses against him.

In addition, as I indicated, Amjad Rahim also gave
statements, Your Honor, implicating my client in the arson. Now,
it also, I think, is going to bring in some hearsay issues,
because it seems like on some of the occasions, Mr. Rahim
indicates that Mr. Khalil told him that my client was involved in
arsons in the past. It wasn't information that my client gave
directly to Mr. Rahim. So that's going to be hearsay right off
the bat.

And again, if he's saying, well, I got that information
from someone else, and it's going to be Mr. Khalil, well, then
I'm right back to where I started, unable to cross examine Mr.
Khalil with regard to those alleged prior arsons or reputation.

Judge, as the Court knows, the Government cannot
introduce prior bad acts to prove a person's character in order
to show that on a particular occasion that the person acted in
accordance with that character. And we know character -- another

1   word for character is reputation.  So they're trying to get in

2   that reputation evidence to prove that he was a part of this

3   arson as well.  That is strictly prohibited by Rule 404.

4         Additionally, Your Honor, in addition to Mr. Rahim's

5   statements about, again, hearing or knowing that my client was

6   allegedly involved in arsons in the past, Mr. Neymar Yaya says

7   the same thing.  He tells special agents that my client worked

8   with an individual by the name of Ziyad Ziyad (phonetic) in a

9   furniture store, and that that person had had lots of fires and

10   is known by the nickname Fire Extinguisher.  Neymar further

11   opined that Isaam is the right hand man of this individual and

12   that, again, Khalil had told Neymar that Isaam is a professional

13   in lighting fires.

14         So, you know, this is just from the statements.  I'm

15   not really quite sure how they're going to testify.  But it

16   doesn't sound like those two Government witnesses, Neymar Yaya

17   and Amjad Rahim had any direct statement from my client, and it

18   was all hearsay from other individuals.

19         So I would object on hearsay grounds.  I would object

20   on propensity evidence.  It's also extremely prejudicial,

21   obviously, for the jury to hear speculation that my client may

22   have been involved in fires in the past.  Certainly, he has no

23   prior convictions or even investigations into the same, which is

24   part of the reason why I'm asking for a motion to sever in this

25   case, Your Honor.  That way, there's going to be no danger of the

1  jury hearing something that they should not hear and that I would

2  not have the opportunity to cross-examine a witness with regard

3  to those alleged prior, you know, arsons or reputation for the

4  same.  That's all I would have on that issue, Your Honor.

5        THE COURT:  Thank you, Mr. Huff.

6        MR. HUFF:  Thank you.

7        THE COURT:  Who would like to argue?  Ms. Reinitz?

8        MS. REINITZ:  Yes, Your Honor.  Thank you.

9        Your Honor, back to motion, Defendant Jaghama is

10  attempting to prevent the jury from hearing why he became

11  involved in this conspiracy by alleging that his purported prior

12  participation in fires is improper 404(b).

13        In this case, the Defendant's past experience with

14  setting fires is intrinsic to the crime.  It is the reason he is

15  recruited into the conspiracy.  As you heard, Mr. Jaghama has no

16  financial tie to 300 West Indiana Avenue.  He doesn't own the

17  building.  He doesn't own the pizza shop.  He's not renting

18  there, okay.

19        The whole reason he comes into this is because

20  Defendant Khalil wants him to set the fire, because Jaghama has

21  said he has experience in doing this.  So Khalil brings him in

22  for him to set the fire, and Khalil is going to pay him for doing

23  this.  So this is intrinsic, Your Honor, as it proves material

24  allegations in the indictment, specifically in Count 1 overt acts

25  1, 2 and 5, that why he's an active member brought into the

1    conspiracy.

2          Moreover, Your Honor, this directly contradicts the

3    defense that Mr. Jaghama has already put forth to the Government.

4    In a recorded interview after the fire, Jaghama claimed to have

5    no prior knowledge that the fire was going to occur and that he

6    merely went with Mr. Khalil to 300 West Indiana Avenue at 1:30 in

7    the morning to get a part to replace a flat tire on Mr. Khalil's

8    car.  He claimed that when Khalil allegedly began setting the

9    fire without his help, he ran to the bathroom because he was

10   scared.  And when he came out of the bathroom, the fire was lit

11   and he left with Khalil.

12         Testimony by witnesses at trial will show that Jaghama

13   had told people that he had experience with setting fires.  And

14   this directly contradicts the Defense that he has already put

15   forth to the Government.  Not allowing the jury to hear why

16   Jaghama was recruited into the conspiracy, Your Honor, will allow

17   this Defendant to lie to the jury.  It will allow him to say, I

18   had no interest in this building.  Why would I have anything to

19   do with this?  It is his purported knowledge that makes him a

20   valuable member of the conspiracy.

21         If the Court does, however, Your Honor, find that it is

22   not intrinsic, as the Government puts forth, but instead finds

23   that an analysis under 404(b) is appropriate, the evidence should

24   still be admitted.  This evidence would show the relationship and

25   the criminal association between Jaghama and the members of the

1  conspiracy and Jaghama's role in the scheme.  Moreover, testimony

2  about Jaghama's prior experience with fires will show his intent,

3  plan, knowledge, absence of mistake, and lack of accident.  Five

4  reasons that this evidence is all allowed under 404(b), Your

5  Honor.

6          Moreover, as to the motion to sever, Your Honor,

7  there's simply no reason to sever these trials.  The Defendants

8  are properly joined in the indictment because they are accused of

9  conspiring and setting the same fire.  Judicial economy and

10 convenience, as well as the toll two trials would take on

11 victims, Your Honor, weigh heavily against severing the trials,

12 as does the fact that joint trials of co-conspirators allow the

13 jury to see the complete picture of the scheme.  And simply put,

14 Jaghama cannot beat the high burden of establishing that he would

15 be denied a fair trial by being tried with Khalil.

16          Now, Jaghama bases his motion on confessions, as he

17 calls them by Khalil, that were given subject to a proffer

18 letter, Your Honor.  As we stand here in Court today, what was

19 discussed in those proffers cannot be entered into evidence.  If

20 Mr. Khalil decides to take the stand in his own defense at trial,

21 Mr. Jaghama's attorney is free to cross-examine him about

22 everything that he says.

23          And because these statements by Mr. Khalil were given

24 under proffer letters, if we come to a point in the trial where

25 he violates the proffer agreement and statements that he made to

1   the Government become admissible, it is easier than redacting a

2   recorded transcript, Your Honor, to introduce statements through

3   an agent.  The Court can instruct the Government as to what it's

4   allowed to say.  Any mention of Jaghama can be effectively

5   redacted in the agent's testimony about the proffer, and this can

6   lead to avoiding any possible Bruton issues.

7          Now, Your Honor, the Supreme Court recently ruled on

8   this issue in Samia v. United States, where it reinforced that a

9   co-Defendant's confession cannot mandate severance in every

10  trial, as the Supreme Court said it was, quote, "too high a price

11  to pay."  And in that case, Your Honor, the Supreme Court ruled

12  that a redaction to a co-Defendant's statement referencing the

13  Defendant as, quote, "the other person," even if the identity of

14  that person may promptly be surmised from evidence at trial, is

15  permitted, provided it is accompanied by a limiting instruction.

16         So, Your Honor, if we get to the point in the trial

17  where Mr. Khalil's proffer statements become admissible evidence,

18  they can easily be modified to not impact any Bruton, and Your

19  Honor can give a limiting instruction.  It is not a basis to

20  sever these trials, Your Honor, and we would ask that you would

21  deny that motion.

22         THE COURT:  So you have no intention at this point to

23  enter the proffers and the transcripts of the proffers or the

24  notes of the proffers to only the agent who was involved in those

25  proffers?

1          MS. REINITZ:  And, frankly, Your Honor, for the record,

2    both Defendants have proffered.

3          THE COURT:  I'm referring to Mr. Khalil's.

4          MS. REINITZ:  Mr. Khalil.  If there is a violation of

5    the proffer agreement, meaning he attempts to argue through

6    himself or his counsel something different than what he was told

7    in the proffers, it would be the Government's intention to call a

8    case agent who was present for the proffers to testify about the

9    statements that were given, not to enter in a report of

10   investigation or any notes.

11         THE COURT:  Are there any other areas other than the

12   proffer letters where this Bruton problem can emanate from?

13   Without proffers, without the statements, and without Mr. Khalil

14   testifying?

15         MS. REINITZ:  Well, Your Honor, today --

16         THE COURT:  You definitely want to link --

17         MS. REINITZ:  Right.

18         THE COURT:  -- between them that you allege existed

19   because he was recruited by Mr. Khalil.

20         MS. REINITZ:  And today, Your Honor, you heard Mr.

21   Khalil's interview.  You may have noted, Your Honor, that he

22   specifically leaves out Isaam Jaghama being at La Casa Pizza, or

23   that he saw Isaam Jaghama at any point that night.  And,

24   certainly, if there is a -- if the Government decides to use

25   another recorded statement where Mr. Jaghama is mentioned, I

1    can't think of one off the top of my head that we would use, Your

2    Honor, but if there is one, of course, we would discuss that with

3    Defense counsel to make sure we're all in agreement as to any

4    appropriate redactions or any Bruton issues.

5          THE COURT:  Well, what do you think, then, the Defense

6    of Mr. Jaghama is worried about because of hearsay statements

7    coming in?  Because you have more to say about Mr. Jaghama here

8    than just what's in the statements.

9          MS. REINITZ:  You mean from --

10         THE COURT:  Some of that is hearsay.

11         MS. REINITZ:  -- other witnesses?  Yeah, Your Honor, I

12   would submit that they're statements by a party opponent, and at

13   the time in which they're given, they're statements by co-

14   conspirators, right.  The evidence at trial will show that for a

15   period of time, it was not just the two of them who were

16   discussing setting fire to this building, right.  And case law is

17   clear that statements of co-conspirators are not subject to the

18   hearsay rule, right.

19         These men are discussing who's going to set the fire,

20   how they're going to set the fire.  Witnesses will talk about Mr.

21   Jaghama coming to Star Pizza in the days before the fire and

22   looking around.  Where can I set the fire?  This is a good spot.

23   Maybe I can do it in the ceiling.  All of that goes into the

24   planning and the preparation of setting this fire, Your Honor,

25   and it's all admissible for that reason.

1          THE COURT:  But the only hearsay I'm hearing is one of

2    your witnesses testifying.  One of the other witnesses, non-law

3    enforcement, about what they observed in the course of the

4    conspiracy, correct?

5          MS. REINITZ:  And, Your Honor, I would argue it's not

6    hearsay.  Not subject to the hearsay rule.

7          THE COURT:  It's two different things you just said.

8    It is hearsay and it is subject to the rule when --

9          MS. REINITZ:  It's an exception.

10         THE COURT:  -- if there's an exception.

11         MS. REINITZ:  There's an exception is a better way to

12   say it.  Thank you, Your Honor.

13         THE COURT:  So you do intend to do some of that with

14   exceptions to the hearsay rule?

15         MS. REINITZ:  Yes.  But, Your Honor, you know, Mr.

16   Khalil, as Mr. Huff said, he gave an accurate summary of the

17   witness statements at this point.  Mr. Khalil is really the only

18   one who knows the specifics about these alleged other fires,

19   where they were.  Obviously, we don't intend to offer in those

20   proffer statements.  We don't think it's important to say and

21   don't intend, Your Honor, that any of our witnesses will have the

22   details of what alleged fires.  It's the idea that he's done this

23   before, which is important.

24         We're not going to get into specifics, right.  It was

25   this fire and that fire.  We're not trying to prove that he set

1   other fires.  He's not charged with those other fires.  But it's

2   important -- and, frankly, Your Honor, it doesn't even matter if

3   he set those fires or not.  What's important is he's saying, I

4   know how to do it.  And that's what the jury needs to hear,

5   because that's why he gets involved.  He's not a needed member of

6   the conspiracy.

7          Mr. Khalil doesn't need to give up any of his money if

8   he can do it himself.  He needs Mr. Jaghama.  He's going to pay

9   him to come in and do this.  He's doing this for the insurance

10  money.  He's not looking to give up money to someone he doesn't

11  need, Your Honor.  So it's important to close that loop for the

12  jury as to why Mr. Jaghama is brought in, why he's needed.

13         THE COURT:  It's how you bring him in.  What

14  statements, from whom, and under what rule of evidence it's

15  permissible.  Obviously, it's a little different than someone

16  getting on the stand and saying, well, I heard this guy was bad,

17  and he did this over there, and he's responsible for these other

18  things, which is so prejudicial that you can't even get to the

19  truth about why or how.

20         So I would need the Government to be mindful of that,

21  because that is not going to happen.

22         MS. REINITZ:  Understood, Your Honor.

23         THE COURT:  All right.

24         MS. REINITZ:  Thank you, Your Honor.

25         THE COURT:  Mr. Huff?

1  MR. HUFF:  Can I just respond briefly, Judge?

2  THE COURT:  You may. You may.

3  MR. HUFF:  If I can just stand here too, Your Honor.

4  Judge, I don't believe that the Government raised Federal Rule of

5  Evidence 803 in their response as being co-conspirator --

6  statements in furtherance of a conspiracy.  So, you know, that

7  was not raised by them in their filings.

8  And when the Prosecutor stood up and said, well, we

9  need to tell the jury, why?  Why was Mr. Jaghama involved in

10  this?  Well, Judge, they're going to hear that there was

11  insurance money that Khalil was supposed to obtain as a result of

12  this fire and that my client was going to be paid with some of

13  that insurance money.  In fact, Mr. Khalil's father gave my

14  client $4,000, which my client turned over to the ATF.

15  So they're going to have that motive that they say that

16  they need in order to prove why my client was involved.  So they

17  have the motive.  The motive is money.

18  And again, Judge, I understand that they said they're

19  not going to get into specifics about, you know, certain fires

20  that my client may or may not have been involved in in the past,

21  and I believe what they said was that it was just important was

22  the idea that he had done this before.  Okay.  Well, where did

23  that idea come from?  If that idea came from hearsay, then it's

24  not admissible, because, again, I don't have the opportunity to

25  cross-examine those people who may have been lying and saying,

1   oh, he has a reputation for doing this.  Okay.  Well, where's

2   that reputation come from?  Well, I heard it from so and so who

3   heard it from so and so who heard it from so and so.

4           So they have their motive.  It's financial.  And again,

5   we just want to give the idea to the jury that he's an arsonist

6   is so prejudicial, Your Honor, and without any proper legal

7   foundation, and I would strongly object to any reference being

8   made that my client had been involved in arsons in the past.

9   Thank you.

10          THE COURT:  You brought something up that, again, the

11  Judge does not read discovery in Federal Court.  Would the

12  Government please tell me about this now allegation, mentioning

13  Rule 803?  And tell me about the money that Mr. Jaghama handed

14  over to the ATF agent.

15          MS. REINITZ:  So, Your Honor, the discovery does make

16  clear, right, that there were multiple people who discussed this

17  fire.  That's where these statements come up.  That's the

18  reference to co-conspirator statements in 803.  I would also

19  state that Mr. Huff is certainly capable of cross-examining any

20  witness about the basis of their knowledge and drawing for the

21  jury whether or not he thinks the jury should find that person's

22  basis to be reliable.  And, I'm sorry, You Honor, what was the

23  second part of your question?  That was 803.

24          THE COURT:  That was 803.  Then it was about the money.

25          MS. REINITZ:  The money.  So, Your Honor, you may

remember that at Mr. Jaghama's motion for bail in front of Your

Honor, Mr. Huff actually told you something much different.  Mr.

Huff told you that that money he received was for Mr. Jaghama to

flee.  And Mr. Jaghama decided not to flee because he didn't have

anything to do with this, and that's why he gave the money over

to the ATF.  He's now admitting, Your Honor, today that it was

partial payment.

MR. HUFF:  That's ridiculous, Your Honor.

THE COURT:  No, I don't think council's argument is an

admission by Mr. Jaghama that it was a payment.  I'm asking what

the Government has on this.

MS. REINITZ:  Your Honor, the Government did receive

the $4,000 from Mr. Jaghama that he said that he got from Mr.

Khalil to flee the country.  And the Government does have it in

its possession, yes.

THE COURT:  But the Government believes it was actually

the payment for the arson?

MS. REINITZ:  Yes.  A portion of the agreed upon price

of $10,000, yes.

THE COURT:  Okay.

MR. MILLER:  And, Judge, that's what I was saying.  I

was saying what they were going to argue.  They needed motive.

Their argument is going to be that that was what the money was

for.  I'm not conceding to that at all.

THE COURT:  I get that.

1    MR. HUFF:  Thank you.

2    THE COURT:  And I don't think that's a concession.

3    Okay.  I'm taking the rest of this under advisement.

4  Is there anything else any counsel wishes to bring to the Court's

5  attention?

6    MS. REINITZ:  Not from the Government, Your Honor.

7  Thank you.

8    THE COURT:  Mr. Peruto?

9    MR. STEIN:  No, Your Honor.

10    THE COURT:  Mr. Stein?

11    MR. STEIN:  Thank you, Judge.  Thank you.

12    THE COURT:  Mr. Huff.

13    MR. HUFF:  Thank you.

14    THE COURT:  Thank you very much.  We're adjourned.

15    (Proceedings concluded at 3:13 p.m.)

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, Jessica B. Cahill, Court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated: November 15, 2023

_Jessica B. Cahill_

Jessica B. Cahill, CER/CET-708